IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Jointly Administered<br>: Case No. 03-12339 (PJW) |
| PILLOWTEX CORPORATION, et al., | : |
| Debtors. | : Chapter 11<br>: |
| | : |
| PILLOWTEX CORPORATION and<br>FIELDCREST CANNON, INC. | : |
| | : |
| Plaintiffs, | : |
| | : C.A. No. 06-615 (GMS) |
| v. | : |
| | : |
| BOSCOV'S, INC. and<br>BOSCOV'S DEPARTMENT STORE, LLC, | : |
| | : |
| Defendants. | : |
| | : |

**DEFENDANTS' OPENING BRIEF IN
SUPPORT OF THEIR MOTION TO TRANSFER VENUE**

STEVENS & LEE, P.C.
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 N. Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 654-5180
Telecopier: (302) 654-5181
E-mail: jg@stevenslee.com
   tgw@stevenslee.com

STEVENS & LEE, P.C.
Steven J. Adams, Esquire
111 N. Sixth Street
P.O. Box 679
Telephone: (610) 478-2133
Telecopier: (610) 988-0841
E-mail: sja@stevenslee.com

Dated:  October 18, 2006   *Attorneys for Boscov's, Inc. and
Boscov's Department Store, LLC*

## TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ......................................... 1

II.  COMBINED NATURE AND STAGE  OF THE PROCEEDING AND
     STATEMENT OF FACTS .......................................... 3

     A. The Pillowtex Bankruptcy Cases .......................... 3

     B. The Adversary Proceeding And The Plaintiffs'
        Transactions With The Defendants ....................... 4

III. ARGUMENT .................................................... 7

     A. The Forum Selection Clause Governing the Parties'
        Transactions Must Be Given Full Effect ................. 7

     B. Alternatively, Standards Applicable Under Federal
        Rule of Bankruptcy Procedure 7087 Merit Venue
        Transfer .............................................. 10

     C. In the Interests of Justice and For the Convenience
        of the Parties, This Adversary Proceeding Should Be
        Transferred to the Pennsylvania Court ................. 11

        1. Both The Defendants And The Plaintiffs Are, or
           Were, Located In Pennsylvania ...................... 13
        2. The Sources Of Proof For Both  Parties Are
           Located In Pennsylvania or Some Locale Other Than
           Delaware .......................................... 14
        3. Unwilling Witnesses Are Not Within  The Subpoena
           Power Of The Court ................................ 17
        4. The Expenses Associated With Obtaining Witnesses
           Will Be Greatly Reduced If This Adversary
           Proceeding Is Transferred To Pennsylvania ......... 18
        5. The Court Must Be Reasonably Accessible To All
           Parties ........................................... 18
        6. Pennsylvania Has A Public Policy Interest In This
           Proceeding ........................................ 19
        7. The Economics Of Administration Of The Estate Are
           Not At Issue Because The Debtors Are Liquidating .... 20
     D. Precedent From This District Dictates    That Venue
        Should Be Transferred To Pennsylvania ................. 21

IV.  CONCLUSION ................................................ 27

## TABLE OF AUTHORITIES

CASES

*In re Access Care, Inc.,*
   333 B.R. 706 (Bankr. E.D. Pa. 2005) ........................ 10

*In re Bennett Funding Group, Inc.,*
   259 B.R. 243 (N.D.N.Y. 2001) ........................... 9, 11

*In re Centennial Coal, Inc.,*
   282 B.R. 140 (Bankr. D. Del. 2002) ..................... *Passim*

*Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,*
   709 F.2d 190, 202 (3d Cir. 1983), *cert denied*, 464 U.S.
   938, 78 L.Ed.2d 315, 104 S.Ct. 349 (1983) .................... 7

*In re Continental Airlines, Inc.,*
   133 B.R. 585 (Bankr. D. Del. 1991) ..................... 10, 13

*In re DeMert & Dougherty, Inc.,*
   271 B.R. 821, 829 (Bankr. N.D. Ill. 2001) ................... 5

*In re Diaz Contracting, Inc.,*
   817 F.2d 1047 (3d Cir. 1987) ........................ 7, 9, 10

*In re Hechinger Investment Company,*
   288 B.R. 398 (Bankr. D. Del. 2003) ..................... 10, 13

*Internal Revenue Service v. CM Holdings, Inc.,*
   1999 U.S. Dist.  LEXIS 10054 (D. Del. 1999) ................. 16

*In re Omna Medical Partners, Inc.,*
   2000 Bankr. LEXIS 1317, *14 (Bankr. D. Del. 2000) ............ 7

*M/S Bremen v. Sapata Off-Shore Co.,*
   407 U.S. 1, 32 L.Ed.2d 513, 92 S.Ct. 1907 (1972) ... 7, 8, 9, 10

*In re Safety Kleen,*
   2001 Bankr. LEXIS 1296 (Bankr. D. Del. 2001) ........ 11, 23, 25

*In re Southwinds Assocs., Ltd.,*
   115 B.R. 857 (Bankr. W.D. Pa. 1999) ..................... 13

*Strategic Mktg. & Communications v. Kmart Corp.,*
   41 F.Supp.2d 268 (S.D.N.Y. 1998) ........................ 11

*In re Whilden,*
   67 B.R. 40 (Bankr. M.D. Fla. 1986) ........................ 10

**STATUTES, RULES & REGULATIONS**

11 U.S.C. § 542(b) ............................................... 4

28 U.S.C. § 157(b)(2) ........................................... 10

28 U.S.C. § 1412 ............................................. 12, 24

Federal Rule of Bankruptcy Procedure 7087 ..................... 10

Federal Rule of Civil Procedure 45 ............................ 17

SL1 670314v1/001857.00080

## I. SUMMARY OF ARGUMENT

This adversary proceeding should be transferred to the United States District Court for the Eastern District of Pennsylvania, Reading Division (the **"Pennsylvania Court"**), pursuant to the parties' prepetition contractual agreement that all disputes, such as the ones raised by this adversary proceeding, would be litigated in Pennsylvania. In addition, transfer of venue is warranted by the factors typically considered in a forum non conveniens analysis.

1. The transactions which give rise to this litigation were entered into pursuant to Boscov's Terms and Conditions of sale that were contained in its purchase orders issued by Defendants and published on Defendants' website. Included in the Terms and Conditions was a provision whereby the parties agreed that any and all litigation between them would be governed by Pennsylvania law and would be heard by a state or federal court sitting in Berks County, Pennsylvania. That forum selection clause is enforceable.

2. Furthermore, the current venue bears no relation to the location of the parties, the witnesses and the proof that is part of each contract of sale between the Plaintiffs and the Defendants. This proceeding involves transactions that took place in Pennsylvania. Most, if not all, of the witnesses who

will be called to testify at trial are current and former employees of the Defendants and the Plaintiffs who reside in Pennsylvania or some other non-Delaware locale and will have to travel in any event.

3.    Most, if not all, of the other evidence and sources of proof, including the books and records of both the Defendants and the Plaintiffs, as well as records and documents from the parties' banking institutions, also are located in Pennsylvania or some other non-Delaware locale.

4.    Moreover, transferring venue to the Pennsylvania Court will not disrupt any reorganization effort in the main bankruptcy cases as the Debtors' amended disclosure statement has been approved and there can be no credible claim that the money Plaintiffs are seeking from the Defendants will have any material impact on the distribution scheme under the amended liquidating plan.    Accordingly, transferring venue to the Pennsylvania Court will serve the convenience of the parties and the interests of justice.

2

## II.  COMBINED NATURE AND STAGE
## OF THE PROCEEDING AND STATEMENT OF FACTS

### A. The Pillowtex Bankruptcy Cases

On July 30, 2003 (the **"Petition Date"**), Pillowtex Corporation and Fieldcrest Cannon (and other various subsidiaries and affiliates) (collectively, the "**Debtors**") commenced this, their latest bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**).  *See Voluntary Petition* (Docket No. 1); Motion for Joint Administration of Related Chapter 11 Cases (Docket No. 3).  The Debtors were a major manufacturer, designer and seller of home textile products.  These products were sold to mass merchants, department and specialty stores, wholesale clubs, catalog merchants, institutional Distributors and international customers. As of the Petition Date, the Plaintiffs reported $7,541,844.18 and $283,707,240.11 in respective assets and $215,050,747.12 and $30,473,585.27 in respective liabilities. *See* Schedules of Assets and Liabilities *(*Docket Nos. 441 and 453*)*.

On March 12, 2006, the Debtors filed their Amended Disclosure Statement (the "**Amended Disclosure Statement**"). (Docket No. 2197).  The Court approved the Amended Disclosure Statement on March 13, 2006. (Docket No. 2201).  For reasons

3

unknown to the Defendants, there has been no confirmation hearing to date.

### B. The Adversary Proceeding And The Plaintiffs' Transactions With The Defendants

Plaintiffs commenced this adversary proceeding on July 28, 2006 by filing its *Complaint* against the Defendants (Docket No. 1) (the **"Complaint"**). The Complaint seeks to recover $127,993.89 on account of Defendants Boscov's, Inc. (**"Parent Company"**) and Boscov's Department Store, LLC (**"Boscov's"**) and together with the Parent Company (the **"Defendants"**) alleged failure to make full and timely payment for goods that are avoidable pursuant to Section 542(b) of the Bankruptcy Code. *See* Complaint, ¶ 3.

On August 28, 2006, the Defendants' filed their Motion for a Determination by the Bankruptcy Court that this Adversary Proceeding is a Non-Core Matter (the **"Non-Core Motion"**) (Docket No. 5) and their Motion to Withdraw the Reference of this Adversary Proceeding (the **"Withdrawal Motion"**) (Docket No. 6). The Plaintiffs filed one response to both (Docket No. 11). Recognizing that the Plaintiffs did not oppose the relief requested in the Non-Core Motion, by Order dated September 26, 2006, the Court granted the Non-Core Motion and determined that all claims asserted in the adversary proceeding are non-core matters. (Docket No. 16). The Withdrawal Motion remains

4

pending, but briefing has been completed and the Withdrawal Motion has been transmitted to the District Court for consideration. (Docket No. 18).

The Defendants are a Pennsylvania corporation and a Pennsylvania limited liability company that purchased goods from the Plaintiffs, Delaware corporations not conducting business within Delaware, pursuant to purchase orders, for goods to be provided under such purchase orders in Pennsylvania. *See* Affidavit of Ann Hinrichs, ¶¶ 1 and 15.[1]  Boscov's has been purchasing goods from Plaintiffs for over 13 years. *See* Affidavit of Ann Hinrichs, ¶ 9.  Plaintiffs, like all vendors conducting business with Boscov's, were advised orally that all transactions with Boscov's were subject to Boscov's standard written Terms and Conditions of sale (the **"Terms and Conditions"**),[2] and that all sales were subject to the Boscov's

---

[1] A court may consider affidavits and other forms of evidence in ruling on the procedural questions of jurisdiction and whether to abstain or transfer venue. *In re DeMert & Dougherty, Inc.*, 271 B.R. 821, 829 (Bankr. N.D. Ill. 2001).

[2] The applicable terms and conditions are Boscov's standard written Terms and Conditions of sale applicable to all vendors. *See* Ann Hinrichs Affidavit, ¶¶ 6 and 7.  These terms and conditions have been in place since at least March 12, 2001. *See* Affidavit of Ann Hinrichs, ¶ 7.  Theses terms and conditions are posted on Boscov's website under the Vendor section. *See* Affidavit of Ann Hinrichs, ¶ 8.  The Forum selection clause is located at paragraph 22. *See* Affidavit of Ann Hinrichs, ¶ 14. According to the Affidavit of Ann Hinrichs, the Plaintiffs' business representative knew that all sales were subject to the Terms and Conditions and Plaintiffs never objected to the application of these Terms and Conditions to all transactions between Plaintiffs and Boscov's. *See* Affidavit of Ann Hinrichs, ¶¶ 10 and 11.  All documents in the possession of the

Terms and Conditions. *See* Affidavit of Ann Hinrichs, ¶ 10. Each purchase order contained Boscov's standard Term and Conditions of sale which includes, among other things, a specific forum selection clause. *See* Affidavit of Ann Hinrichs, ¶¶ 12 and 14. The Terms and Conditions governing the transactions between the parties make clear that any dispute between the parties would be governed by the laws of the Commonwealth of Pennsylvania and be adjudicated by a state of federal court in Berks County, Pennsylvania. *See* Affidavit of Ann Hinrichs, ¶ 14. A copy of the Terms and Conditions are attached to the Hinrichs Affidavit as Exhibit A. *See* Affidavit of Ann Hinrichs, ¶ 7. Vendors, like the Plaintiffs, were also advised orally that the transactions with Boscov's were subject to the Terms and Conditions. *See* Affidavit of Ann Hinrichs, ¶ 10. All goods that Boscov's purchased from the Plaintiffs were purchased pursuant to purchase orders issued by Boscov's from its offices in Pennsylvania, and all such goods were delivered to Boscov's facilities in Pennsylvania. *See* Affidavit of Ann Hinrichs, ¶ 15.

---

Defendants that relate to the issues raised in this adversary proceeding, and the Defendants witnesses, are located in Pennsylvania. *See* Affidavit of Ann Hinrichs, ¶ 17.

6

## III.  ARGUMENT

### A. The Forum Selection Clause Governing the Parties' Transactions Must Be Given Full Effect.

Forum selection clauses are presumptively valid and enforceable, absent compelling public policy considerations or serious inconvenience to the parties. *See M/S Bremen v. Sapata Off-Shore Co.*, 407 U.S. 1, 10, 32 L.Ed.2d 513, 92 S.Ct. 1907 (1972); *In re Diaz Contracting, Inc.*, 817 F.2d 1047 (3d Cir. 1987); *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983), *cert. denied*, 464 U.S. 938, 78 L.Ed.2d 315, 104 S.Ct. 349 (1983); *In re Omna Medical Partners, Inc.*, 2000 Bankr. LEXIS 1317, *14 (Bankr. D. Del. 2000). The above premise is known as the *M/S Bremen* rule, which is as follows:

> . . . rule is that a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstance of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

*Coastal Steel*, 709 F.2d at 204.

Based on Third Circuit precedent, the *M/S Bremen* rule is applicable in bankruptcy proceedings. *Diaz Contracting*, 817 F.2d at 1050.

SL1 670314v1/001857.00080

The Defendants submit that Plaintiffs can not meet their burden under the *M/S Bremen* rule and the Court should transfer venue. The transactions between the parties were documented by written purchase orders which contained an express forum selection clause.

*M/S Bremen* requires that the forum selection clause be given effect and this adversary proceeding be transferred to the Pennsylvania Court. There is no credible argument that the forum selection clause operable in this matter, which was never objected to during the lengthy business relationship between the parties, was the result of "fraud" or "overreaching". Thus, the Plaintiffs cannot make a credible argument as to prong one of the *M/S Bremen* rule.

The Plaintiffs also cannot satisfy prong two of the *M/S Bremen* rule. Prong two requires the Plaintiffs to prove that enforcement of the forum selection clause violates a strong public policy which exists in this District. The only argument that can made, although a losing argument in this matter, is that enforcing the forum selection clause would violate the policy of centralizing all proceedings in a bankruptcy case the bankruptcy court where the case is pending. The reason that argument fails is that this Court has already ruled that the allegations underlying the Complaint are "non-core" matters. When the matter is non-core the "policy behind centralizing core

8

matters in the bankruptcy court is not applicable." *See In re Bennett Funding Group, Inc.*, 259 B.R. 243, 252 (N.D.N.Y. 2001). Plaintiffs clearly not meet their burden with respect to prong two of the *M/S Bremen* rule.

Prong three of the *M/S Bremen* rule is also not supportable by the facts. To satisfy this prong, the Plaintiffs must prove that enforcement of the forum selection clause is so ". . . seriously inconvenient, 'such that the resisting party would be effectively deprived of its day in court.'" *Diaz Contracting*, 817 F.2d at 1052. "Mere inconvenience or additional expense is not the test of unreasonableness." *Id.* at 1053. Proving unreasonableness requires a party to meet a "strict standard of proof." *Id.* at 1052. Plaintiffs would need to show that their records, evidence and witnesses could not be transported to Pennsylvania. To meet this heavy burden, however, would effectively argue against the litigation proceeding in Delaware as the Plaintiffs' records, evidence and witnesses, which are all outside the confines of Delaware, will need to be shipped to this jurisdiction in any event.

Importantly, the *Diaz Contracting* Court also made clear that the fact that the Debtors had been unable to confirm a plan of reorganization "has little or no bearing" on its ability to commence litigation in another jurisdiction. *See Diaz Contracting*, 817 F.2d at 1053. The Court went on to point out

9

that transferring litigation, like the instant litigation, should pose no problems that would mandate "non-enforcement of the forum clause." *Id.*

Since the Debtors cannot meet its high burden under *M/S Bremen* rule, this adversary proceeding should be transferred to the Pennsylvania Court. *See In re Access Care, Inc.*, 333 B.R. 706 (Bankr. E.D. Pa. 2005).

### B. Alternatively, Standards Applicable Under Federal Rule of Bankruptcy Procedure 7087 Merit Venue Transfer

The Court may transfer an adversary proceeding to another district,[3] pursuant to Federal Rule of Bankruptcy Procedure 7087, which provides, in relevant part:

> Rule 7087. Transfer of Adversary Proceeding.
>
> On motion and after a hearing, the Court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412 . . .

Although there is a presumption in favor of maintaining a plaintiff's chosen venue where the bankruptcy case is pending, such choice is subject to challenge. Indeed, the presumption afforded a plaintiff's venue choice is rebutted when the selected forum has no direct relation to the operative,

---

[3] A bankruptcy judge may transfer venue of an adversary proceeding as a motion to change venue is a "core" proceeding under 28 U.S.C. § 157(b)(2). *See In re Whilden*, 67 B.R. 40 (Bankr. M.D. Fla. 1986); *In re Hechinger Investment Company*, 288 B.R. 398 (Bankr. D. Del. 2003); *In re Continental Airlines, Inc.*, 133 B.R. 585 (Bankr. D. Del. 1991).

SL1 670314v1/001857.00080

underlying facts of the proceeding and the proceeding has no bearing on a reorganization effort. *See In re Centennial Coal, Inc.*, 282 B.R. 140, 144-145 (Bankr. D. Del. 2002). This is especially true when the matter is non-core because the "policy behind centralizing core matters in the bankruptcy court is not applicable." *See In re Bennett Funding Group, Inc.*, 259 B.R. 243, 252 (N.D.N.Y. 2001). Additionally, when the parties agree to a mandatory forum selection clause within the operative agreements, deference to the plaintiff's choice of forum is inappropriate. *See Bennett Funding Group, Inc.*, 259 B.R. at 251, *citing Strategic Mktg. & Communications v. Kmart Corp.*, 41 F.Supp.2d 268, 273 (S.D.N.Y. 1998).

The party moving for a change of venue bears the burden of proof by a preponderance of evidence. *In re Safety Kleen Corp.*, 2001 Bankr. LEXIS 1296, *7-8 (Bankr. D. Del. 2001). The ultimate decision to transfer venue lies within the sound discretion of the trial court. *Id.* Defendants submit the Court should exercise its discretion and order venue to be transferred.

### C. In the Interests of Justice and For the Convenience of the Parties, This Adversary Proceeding Should Be Transferred to the Pennsylvania Court

The facts and circumstances of this proceeding demonstrate that, notwithstanding the Plaintiffs' state of incorporation being Delaware, and the filing of their voluntary petitions in

11

Delaware, there are no other connections between this matter and this judicial district. Conversely, Pennsylvania has a strong nexus to this proceeding inasmuch as the Defendants are Pennsylvania state entities, all of the challenged transactions took place in Pennsylvania, witnesses reside in Pennsylvania, and the other sources of proof are located in Pennsylvania.

Pursuant to 28 U.S.C. § 1412 the Court may transfer the venue of this adversary proceeding "in the interest of justice and for the convenience of the parties." 28 U.S.C. § 1412. Courts have expanded upon this standard and generally take the following eight factors into account when determining appropriate venue:

1. the location of the plaintiff and the defendant;

2. the ease of access to the necessary proof;

3. the availability of subpoena power for the unwilling witnesses;

4. the expense related to obtaining willing witnesses;

5. the enforceability of any judgment rendered;

6. the ability to receive a fair trial;

7. the state's interest in having local controversies decided within its borders, by those familiar with its laws; and

8. the economics of the estate administration.

12

*See In re Hechinger Investment Company of Delaware*, 288 B.R. 398, 402-403 (Bankr. D. Del. 2003); *In re Continental Airlines*, 133 B. R. 585, 588 (Bankr. D. Del. 1991); *In re Southwinds Assocs., Ltd.*, 115 B.R. 857, 862 (Bankr. W.D. Pa. 1999).

These factors essentially embody the *forum non convienens* doctrine and provide a more complete framework to assist in the determination of whether an adversary proceeding should be adjudicated in a forum other than the primary ·district. *Continental Airlines*, 133 B.R. at 588. A review of these factors[4] in the context of the relationship between Plaintiffs and the Defendants and the transactions from which this proceeding arises, as well as the location of the other sources of proof, compels the conclusion that venue of this proceeding should be transferred to the Pennsylvania Court.

### 1. Both The Defendants And The Plaintiffs Are, or Were, Located In Pennsylvania

Defendants are Pennsylvania state entities with offices located in Reading, Pennsylvania. During the time period in which the Plaintiffs conducted business relative to the adversary proceeding, they did so, on information and belief, as entities authorized to do business in Pennsylvania[5]. Moreover,

---

[4] A review of these factors indicates that some are not relevant to this proceeding (i.e., transferring venue would facilitate the enforcement of any judgment entered).

[5] According to the Pennsylvania Corporations Bureau, Plaintiffs were entities authorized to conduct business within the Commonwealth of

13

Plaintiffs, whose headquarters were, on information and belief, located in North Carolina, only real contact with Delaware is that they are incorporated in Delaware and Delaware is the venue of their bankruptcy cases.    Clearly, the Pennsylvania Court, which will have to apply Pennsylvania law, is a more convenient forum for the Defendants, and, at worst, is as convenient a forum for the Plaintiffs as is Delaware.    Assuming most, if not all, of the sources of proof that the Defendants will rely on in this proceeding are located in Pennsylvania (see Affidavit of Ann Hinrichs, ¶¶ 15 and 17), and that most, if not all, of the sources of proof that Plaintiffs will rely on are located in a state other than Delaware, the Pennsylvania Court will be more convenient the Defendants and just as convenient for the Plaintiffs.    To the extent, the sources of proof are located at the Debtors' headquarters in North Carolina or any other location, it will be no more burdensome to transport such proof to Pennsylvania as opposed to Delaware.

### 2. The Sources Of Proof For Both Parties Are Located In Pennsylvania or Some Locale Other Than Delaware

This    adversary    proceeding    arises    out    of    transactions between the Plaintiffs and the Defendants in Pennsylvania.    It

---

Pennsylvania, and Plaintiff Pillowtex remains a registered foreign company.  Defendants respectfully request the Court to take judicial notice of Pennsylvania's public records regarding Plaintiffs' legally authorized status in Pennsylvania.

14

necessarily follows that most of the sources of proof are located in the Commonwealth. For example, the potential witnesses for both parties reside in Pennsylvania or a location other than Delaware.[6] The likely witnesses for Defendants will be its present employees and former employees who were involved in the underlying transactions with Plaintiffs. These individuals continue to live and work in Pennsylvania. Given that the Plaintiffs are no longer conducting business, all of the individuals who would most likely be called as witnesses are Plaintiffs' former employees. Defendants have no information as to the location of these individuals, but submit that they are not in Delaware. As such, to the extent called by subpoena or such witnesses agree to testify, it will be no more difficult for these individuals to appear in the Pennsylvania Court as opposed to Delaware.

As such, a transfer would place no additional burden on Plaintiffs' employees or former employees because they already planned on traveling from wherever located to Delaware. Clearly, it would be as efficient to have Plaintiffs' former employees travel to Pennsylvania rather than forcing separate

---

[6] Given that this adversary proceeding is in its preliminary stages, the Defendants are not in a position to identify witnesses that it will call at the time of trial. However, given the facts at issue and the burdens of proof, it is more than likely that the Defendants' current employees and former employees of both parties will serve as the principal witnesses.

15

companies to incur the expense of producing witnesses in Delaware. Additionally, Plaintiffs' debtor affiliates maintained a facility in Hanover, Pennsylvania, so it is possible some of their witnesses and evidence is already in Pennsylvania. *See* Docket No. 1055.

While the Defendants recognize that their current employees are considered "willing witnesses" who need not be subpoenaed, compelling Plaintiffs' former employees to testify at deposition and/or trial will require the issuance of a subpoena. *Accord Internal Revenue Service v. CM Holdings, Inc.*, 1999 U.S. Dist. LEXIS 10054, *14 (D. Del. 1999) (noting that non-party witnesses may be unwilling to testify and may not be compelled to do so if they reside more than one hundred miles from the court in which the trial is held). Compelling witnesses' attendance at depositions and trial could be problematic if this matter is not venued in Pennsylvania. Because witnesses for both parties may reside in Pennsylvania, it is clear that Pennsylvania would provide the most convenient forum for this litigation. *Accord In re Centennial Coal, Inc.*, 282 B.R. 140, 146 (Bankr. D. Del. 2002) (noting that where the witnesses are all either current employees or former employees of one of the parties, the forum of the parties' principal place of business would be most convenient). To the extent witnesses, who are outside subpoena power of Court, agree to testify, coming to Pennsylvania is no

16

more burdensome.    Moreover,  other  sources  of  proof,  including

the  Defendants'  books  and  records  and  documents  from  the

parties'  banking  institution  are  located  in  Pennsylvania  or  some

other  location  that  is  not  Delaware.    Even  if  the  Plaintiffs'

books  and  records  are  now  located  in  North  Carolina,  rather  than

Delaware,  they,  again,  are  as  easily  transported  from  North

Carolina  to  Pennsylvania  as  from  North  Carolina  to  Delaware.    To

the  extent  such  books  and  records  are  still  located  in  North

Carolina,  the  balance  tips  even  more  heavily  to  the  Pennsylvania

Court.

### 3. Unwilling Witnesses Are Not Within The Subpoena Power Of The Court

As  set  forth  above,  the  witnesses  called  by  both  parties

will  most  likely  be  the  Defendants'  present  and  former  employees

and  former  employees  of  Plaintiffs  who  were  involved  in

Plaintiffs'  dealings  with  the  Defendants.    Federal  Rule  of  Civil

Procedure  45  limits  this  Court's  subpoena  powers  to  witnesses

who  reside  within  one  hundred  miles  of  the  Court.    *See* Fed. R.

Civ. P. 45.    Thus,  unless  venue  is  transferred  to  Pennsylvania,

the  Defendants  may  be  precluded  from  subpoenaing  former

employees  of  the  Plaintiffs  to  appear  at  trial  of  this

proceeding.    Further,  if  venue  of  this  proceeding  is  transferred

to  Pennsylvania,  all  non-party  witnesses  and  documents  may  be

within  the  subpoena  power  of  the  Pennsylvania  Court.

17

**4. The Expenses Associated With Obtaining Witnesses Will Be Greatly Reduced If This Adversary Proceeding Is Transferred To Pennsylvania**

As stated above, the witnesses who will most likely testify at trial -- the Defendants' employees and former employees and the Plaintiffs' former employees -- reside in Pennsylvania or some other non-Delaware locale. Clearly, the expenses incurred by both parties would be drastically reduced or, at least no more burdensome, if this case was transferred to Pennsylvania.

**5. The Court Must Be Reasonably Accessible To All Parties**

The Defendants have no doubt that it would receive an unbiased and impartial trial in either forum. However, the Defendants submit that in order for a proceeding to be considered fair, all parties must have relatively easy access to the Court. If the venue of this case is not transferred, the Defendants will be compelled to incur the burden and expense of presenting evidence and witnesses in this Court which is approximately 60 miles from its place of business and contrary to its agreement with Plaintiffs. Given that the underlying transactions arose in Pennsylvania and governed by Pennsylvania state law, it would be patently unfair to force Defendants to defend an approximately $127,000 "turnover" action in Delaware. When the parties entered into the purchase orders in Pennsylvania, the Defendants had no expectation that they would

18

be haled into court in Delaware to defend these claims.    In fact, the express language within the purchase orders contained a choice of forum clause stating Pennsylvania law would be applied in a Pennsylvania court within Berks County, Pennsylvania which Plaintiffs agreed to.    In the interests of fairness to the Defendants, this case should be transferred to Pennsylvania.    *Accord Centennial Coal*, 282 B.R. at 148 (noting the significant burden imposed upon parties to an agreement made in Kentucky to participate in litigation commenced in Delaware).

### 6.  **Pennsylvania Has A Public Policy Interest In This Proceeding**

Defendants submit that this element favors transfer because the adversary proceeding implicates Pennsylvania state law or public policy.    At a minimum, from the Defendants' vantage point, the Commonwealth of Pennsylvania certainly has more of an interest in a dispute between its current and former residents than does Delaware.    To the extent that Delaware has an interest, it is general -- ensuring proper administration of certain alleged assets of a post-confirmation debtor's estate -- which in the context of a non-core adversary case can be as easily and efficiently handled by the Pennsylvania Court.

### 7. The Economics Of Administration Of The Estate Are Not At Issue Because The Debtors Are Liquidating

As set forth above, the Debtors' Amended Disclosure Statement has been approved and the Debtors are marching down the road towards Confirmation of their amended liquidating plan. Thus, transferring this proceeding to Pennsylvania, cannot reasonably have any material adverse impact the administration of the estate or the confirmation of any plan. *Accord Centennial Coal*, 282 B.R. at 145 (finding that an adversary proceeding commenced for the sole purpose of liquidating accounts receivable is not directly linked to the bankruptcy case).

This adversary proceeding was only recently commenced and is in the preliminary pleading stage. As such, the Court has not developed any specialized knowledge of the facts and issues raised in this action. Further, this case is a relatively routine "turnover" action and the Court's experience with the underlying bankruptcy case likely will offer no additional insight to assist in the prompt resolution of the Plaintiffs' state law claims. *Accord Centennial Coal*, 282 B.R. at 145 (transferring an adversary proceeding in the preliminary pleading stage with which the Court had little or no familiarity). In sum, the Pennsylvania Court can adjudicate

20

this proceeding just as effectively and efficiently as this Court.

### D. Precedent From This District Dictates That Venue Should Be Transferred To Pennsylvania

The facts and circumstances at issue in this proceeding are highly analogous to prior cases in which this Court has found that transferring venue was appropriate. For example, in *Centennial Coal*, the Court held that venue of an adversary proceeding should be transferred to Kentucky because the underlying transactions took place in that state. In *Centennial Coal*, a liquidating agent, acting on behalf of the debtors, commenced an adversary proceeding against Coal Equity, Inc. (**"Coal Equity"**) and Louisville Gas & Electric Company (**"LG&E"**) seeking to recover monies allegedly due and owing under a coal and supply agreement. *Id.* at 142. LG&E moved to transfer venue of the adversary proceeding to the United States District Court for the Western District of Kentucky on the grounds that such would serve the convenience of the parties, witnesses and the court and the interests of justice. *Id.* at 143-144. In support of its motion, LG&E highlighted that: (i) the coal supply agreement was negotiated and consummated in Kentucky, (ii) the agreements were performed in Kentucky; (iii) the transactions took place in Kentucky, (iv) most of the parties and witnesses resided in Kentucky; and (v) the principal place of business of

21

the debtor was in Kentucky. *Id.* at 144-146. The Court summarized Kentucky's nexus with the litigation as follows:

> . . . [N]ot only did each of the events giving rise to the claims and defenses in this action take place in Kentucky, but also, the outcome of this proceeding will likely turn on evidence that will be more easily obtained and/or produced in Kentucky.

*Id.* at 146.

The plaintiff's opposition to LG&E's motion placed heavy reliance on the general presumption favoring a plaintiff's choice of venue. *Id.* at 144. The Court rejected plaintiff's arguments and held that venue should be transferred to Kentucky. *Id.* Of significance, the Court stated that although the plaintiff's choice of venue should be given significant weight, the deference traditionally afforded a plaintiff was outweighed by the fact that Delaware had no "direct relation to the operative, underlying facts of the proceeding." *Id.* at 144-145. The Court also noted that the adversary proceeding had no bearing on a reorganization effort given that the debtor's liquidation plan had been substantially consummated. *Id.*

In reaching this conclusion, the Court reviewed the multi-pronged test used to assess venue motions in the context of the facts of the case and found that the venue selected by the plaintiff had virtually no relationship with the underlying transactions. *Id.* at 144. At the outset, the Court observed

22

that the adversary proceeding would have little impact on the administration of the estate given that it involved the liquidation of an account receivable. *Id.* at 145. It was also significant that the adversary proceeding was in the preliminary pleading stage and the Court had not developed a familiarity with the specific facts such that it would enable the proceeding to be adjudicated more efficiently in Delaware. *Id.* The Court noted that its familiarity with the underlying bankruptcy cases offered no additional insight that would assist in the adjudication of the adversary proceeding given that it arose out of an independent contractual dispute. *Id.* One final consideration that tipped the scales in favor of transferring venue was the fact that the parties and witnesses were located in or near Kentucky thus making it significantly burdensome and expensive for the defendants to litigate in Delaware. *Id.* at 146.

Transferring venue to the state where the relevant transactions took place was also a compelling factor in the Court's decision in *In re Safety Kleen*, 2001 Bankr. LEXIS 1296 (Bankr. D. Del. 2001), where the adversary proceeding was transferred to South Carolina because the events which gave rise to the litigation took place in South Carolina. The facts of *Safety Kleen* are as follows. The debtors, who operated a hazardous waste storage and disposal facility in South Carolina,

23

commenced an adversary proceeding to enjoin the enforcement of certain orders issued by the South Carolina Department of Health & Environmental Control requiring one of the debtors, Safety Kleen (Pinewood), Inc. (**"Pinewood"**) to shut down its hazardous waste facility (the **"Facility"**). *Id.* at *3-4. The County of Sumter, a defendant in the adversary proceeding, moved to transfer venue to South Carolina because Pinewood was incorporated and headquartered in South Carolina and the Facility was located in that state. *Id.* at *4.

The Court granted Sumter County's motion finding that transferring venue was in the best interest of the parties and served the interest of justice. *Id.* at *8. The Court reviewed the elements of Section 1412 of the Bankruptcy Code and found that they weighed in favor of transferring venue. *Id.* The first factor, the proximity of the court to the interested parties, balanced in favor of transfer because the Facility was operated in South Carolina and Pinewood was incorporated and headquartered in that state. *Id.* at *8-9. Thus, the Court concluded that the majority of the books and records, the responsible parties and the relevant witnesses were presumably located in South Carolina. *Id.* The Court also found that transferring venue did not have an adverse impact on the economics of administering the estate because the case did not involve a claim against the estate. In sum, the case was

24

transferred because the records, the responsible parties, witnesses and evidence were most likely located in South Carolina. *Id.* at * 10.

The rationale supporting the transfer of venue in *Centennial* and *Safety Kleen* is equally compelling in the instant proceeding. Indeed, a review of the following considerations taken into account in those cases, when viewed in light of the facts of the case at bar, evidences that this Court's holdings dictate that this proceeding should be transferred to Pennsylvania:

> (1) the transactions between Plaintiffs and the Defendants took place in Pennsylvania;
>
> (2) all transactions between the parties, including the sale and purchase of goods and/or services, occurred in Pennsylvania;
>
> (3) this adversary proceeding is not intricately related to the Debtors' underlying bankruptcy cases;
>
> (4) the Court has not developed a familiarity with this adversary proceeding inasmuch as it is in the preliminary pleading stage[7];
>
> (5) the Debtors' liquidating plan has been confirmed and, as such, a transfer of this proceeding would not delay the administration of their estates;
>
> (6) the outcome of this preference action will have little, if any, impact on the Debtors' estates;

---

[7] In fact, if the District Court grants Defendants' Withdrawal Motion, the Court handling this case in Delaware will have even less experience with this case.

(7) the parties, witnesses and the relevant places of business of the parties are located in Pennsylvania;

(8) the outcome of this proceeding will turn upon the books, records, banking documents and other evidence that will be more easily obtained and/or produced in Pennsylvania;

(9) the Court's docket is heavily burdened;

(10) the Defendant had no expectation of being haled into court in Delaware at the time that it conducted business with the Plaintiffs. In fact, the transactions were governed by an express choice of forum clause which required any legal proceeding be brought in a federal or state court in Berks County, Pennsylvania.

26

## IV.  **CONCLUSION**

Based upon the foregoing, the venue of this adversary proceeding should be transferred to the United States District Court for the Eastern District of Pennsylvania, Reading Division.

Dated:  October 18, 2006

STEVENS & LEE, P.C.

/s/ Thomas G. Whalen, Jr.
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street,7th Floor
Wilmington, DE 19801
Telephone: (302) 654-5180
Telecopier: (302) 654-5181
E-mail: jg@stevenslee.com
        tgw@stevenslee.com

- and -

Steven J. Adams, Esquire
(Member of PA Bar)
111 N. Sixth Street
P.O. Box 679
Telephone: (610) 478-2133
Telecopier: (610) 988-0841
E-mail: sja@stevenslee.com

*Attorneys for Boscov's, Inc. and Boscov's Department Store, LLC*

27

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PILLOWTEX CORPORATION, <u>et</u> <u>al</u>.,<br><br>        Debtors. | : Jointly Administered<br>: Case No. 03-12339 (PJW)<br>:<br>: Chapter 11<br>:<br>: |
| PILLOWTEX CORPORATION and<br>FIELDCREST CANNON, INC.<br><br>        Plaintiffs,<br><br>        v.<br><br>BOSCOV'S, INC. and<br>BOSCOV'S DEPARTMENT STORE, LLC,<br><br>        Defendants. | :<br>:<br>:<br>:<br>: C.A. No. 06-615 (GMS)<br>:<br>:<br>:<br>:<br>:<br>: |

COMMONWEALTH OF PENNSYLVANIA   :
                               : ss.
COUNTY OF BERKS                    :

**AFFIDAVIT OF ANN HINRICHS IN SUPPORT OF MOTION OF THE
DEFENDANTS TO TRANSFER VENUE PURSUANT TO
28 U.S.C. § 1412 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7087**

    Ann Hinrichs, being duly sworn according to law, deposes and says as follows:

    1.    I am an adult individual and a resident of the Commonwealth of Pennsylvania.

    2.    I submit this affidavit in support of Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Federal Rule of Bankruptcy 7087.

1

3. Boscov's, Inc. and Boscov's Department Stores, LLC ("**Boscov's**") (collectively, the "**Defendants**") are, respectively, a Pennsylvania corporation and a Pennsylvania limited liability company. Boscov's Inc. is the holding company of Boscov's.

4. I am employed by Boscov's as a buyer and this affidavit is based on my personal knowledge of the matters subject to the above-referenced adversary proceeding.

5. I have been employed by Boscov's for over 13 years.

6. All vendors conducting business with Boscov's do so pursuant to Boscov's standard written terms and conditions of sale (the "**Terms and Conditions**").

7. The standard written Terms and Conditions that have been in effect at Boscov's since at least March 12, 2001, are attached hereto as Exhibit "A."

8. The Terms and Conditions are also posted on Boscov's website under the Vendor section.

9. I have been purchasing goods from Pillowtex Corporation and Fieldcrest Cannon, Inc. (collectively, the "**Plaintiffs**") on behalf of Boscov's for over 13 years.

10. Plaintiffs, like all vendors conducting business with Boscov's, were advised orally that all transactions with Boscov's were subject to Boscov's Terms and Conditions, and that all sales were subject to the Boscov's Terms and Conditions.

2

11. Plaintiffs never objected to the Boscov's Terms and Conditions.

12. In addition, each purchase order issued by Boscov's to the Plaintiffs contained Boscov's Term and Conditions.

13. The Terms and Conditions attached hereto as Exhibit A govern all transactions between Boscov's and the Plaintiffs that are the subject of this adversary proceeding.

14. Boscov's Terms and Conditions specifically state at paragraph 22 that any dispute between Boscov's and the Plaintiffs would be governed by the laws of the Commonwealth of Pennsylvania and would be adjudicated by a state or federal court sitting in Berks County, Pennsylvania.

15. All goods that Boscov's purchased from the Plaintiffs were purchased pursuant to purchase orders issued by Boscov's from its offices in Pennsylvania, and all such goods were delivered to Boscov's facilities located in Pennsylvania.

16. If this case proceeds to trial, I will be the Defendants' primary witness.

17. All documents in the possession of the Defendants that relate to the issues raised in this adversary proceeding, and

3

the Defendants' other potential witnesses (to the best of my knowledge), are all located in Pennsylvania.

_____
Ann Hinrichs

Sworn to and subscribed before me, the undersigned officer, this 13th day of October, 2006.

_____
Notary Public

> Notarial Seal
> Cheryl M. Boyce, Notary Public
> Exeter Twp., Berks County
> My Commission Expires Mar. 6, 2007
> Member, Pennsylvania Association Of Notaries

4

Exhibit "A"

BOSCOV'S DEPARTMENT STORE LLC

PURCHASE ORDER TERMS AND CONDITIONS

I.    INVOICING INSTRUCTIONS

1.    Mail all Original Invoices to Boscov's Department Store LLC, P O Box 4131, Reading, PA 19606. ATTN: MERCHANDISE ACCOUNTS PAYABLE

2    All terms begin on date of receipt of merchandise or invoice, whichever is later. Under EOM terms, all shipments received on or after the 20th of the month will be dated as the 1st of the following month.

II.    ROUTING, PACKING, TICKETING, EDI, AND OTHER INSTRUCTIONS

1.    YOU MUST HAVE BOSCOV'S MOST CURRENT ROUTING GUIDE IN YOUR POSSESSION PRIOR TO SHIPPING ANY PURCHASE ORDERS. BOSCOV'S ROUTING GUIDE (AS IN EFFECT FROM TIME TO TIME) IS INCORPORATED HEREIN AS AN INTEGRAL PART OF OUR PURCHASE ORDER TERMS AND CONDITIONS. ANY DEVIATION FROM THESE INSTRUCTIONS MAY SUBJECT YOU TO EXPENSE OFFSETS.

2    Please visit Boscov's web site at www.boscovs.com for the most up-to-date information regarding all shipping instructions, including our current routing guide. Click on "Vendor Area" from our home page. You may print the routing guide in either Word or Adobe Acrobat Reader format, or browse through the entire routing guide "online" from our Table of Contents section.

3.    Check our web site often for changes to our guide and other information. You may request updates to be sent to you via email by visiting the Vendor Area of our web site. Click on "Routing Guide," then click on the "Request Email" Updates button.

4.    If you do not have access to the Internet, please contact:

Boscov's Transportation Department
Phone: (610)370-4149
Fax: (610)370-4138
Email: trfmgr@boscovs.com

5.    Boscov's expects all vendors to provide merchandise marked with a UPC bar code and retail price. Additionally, all vendors are expected to have full EDI capabilities, including the ability to receive electronic purchase orders, transmit advance ship notices (ASN) and identify cartons with unique UCC-128 shipping container labels. Hanging merchandise is to be shipped with approved VICS floor-ready hangers inserted.

Additional information is provided in our Routing Guide or from our Vendor Services Dept. at (610)370-4128.

Boscov's Routing Guide includes the following sections:

I.    GENERAL ROUTING INSTRUCTIONS
II.    DISTRIBUTION CENTER INSTRUCTIONS
III.    INVOICING INSTRUCTIONS
IV.    FLOOR READY HANGER PROGRAM
V.    WASTE REDUCTION POLICY
VI.    BOSCOV'S CONTACT PERSONS/EMAIL
VII.    STORE LISTINGS
VIII.    ELECTRONIC DATA INTERCHANGE
IX.    RISK MANAGEMENT

All exceptions must be in writing from Boscov's Transportation Department. At no time will verbal routing instructions be considered as valid.

1

III    GENERAL PURCHASE TERMS AND CONDITIONS

1.    OFFER, ACCEPTANCE, AND MODIFICATION: This order is an offer to Vendor by Boscov's to enter into a purchase agreement on the terms and conditions set forth in this document, any attachments and any specifications and other materials expressly referred to in this document (collectively, the "Agreement")  Vendor shall accept the offer in writing, or by beginning to fill the order or perform the services requested by Boscov's. This Purchase Order shall be the sole and exclusive statement of the purchase agreement between Boscov's and Vendor notwithstanding any terms and conditions that may be contained in any proposal, acknowledgment, confirmation, invoice or other document received from the Vendor, all of which, to the extent they are inconsistent herewith or contain any different or additional terms, are hereby objected to and rejected.  No act of Boscov's in accepting or paying for any goods or services shall constitute consent to Vendor's additional or different terms.  No additional or different terms or conditions proposed by Vendor either orally or in writing shall be a part of this Purchase Order unless expressly agreed to by Boscov's in writing. This order is not valid unless a purchaser's name is included. If the terms specified on this order do not appear on or agree with Vendor's invoice as rendered, Vendor agrees that Boscov's may change the invoice to conform to this order, and make payment accordingly.

2.    PRICE:  The prices to be paid for the goods ordered or services to be performed shall be as set forth in this Purchase Order.  No extra charges of any kind shall be allowed unless specifically agree to in the Agreement.  All prices include all applicable Federal, state, and local taxes, assessments and duties, except for those for which an exemption may be claimed by Boscov's.  If prior to shipment Vendor makes or offers to make sales of the same goods or services to others in the quantities and of like quality, at prices lower than the prices then in effect under this Purchase Order, Vendor shall give Boscov's notice of said lower prices. Said lower prices shall apply on all goods thereafter shipped to or services performed for Boscov's under this Purchase Order.

3.    DELIVERY SCHEDULE; RISK OF LOSS; TRANSPORTATION, AND PACKAGING: Shipment and delivery of goods or performance of services shall be in accordance with the schedule set forth in this Purchase Order unless otherwise agreed to in writing by Boscov's.  All goods are sold to Boscov's "F.O.B. Destination - Freight Prepaid" unless otherwise indicated.  Time is of the essence under this Purchase Order.  Vendor shall promptly advise Boscov's of any inability to make timely shipment.  If Vendor does not, or it appears that Vendor will not, meet Boscov's delivery or work schedule, Boscov's may, in addition to any other rights or remedies provided by law or this Purchase Order: (a) cancel this Purchase Order, in whole or in part, without liability to Vendor except for payment for goods previously shipped and accepted or services previously performed to the extent reasonable in amount; (b) approve an agreed-upon revised delivery or work schedule; or (c) require that Vendor ship via expedited routing to meet such delivery schedule or to recover the time lost.  If Boscov's approves a revised delivery schedule or requires Vendor to ship via expedited routing, any additional transportation cost incurred as a result shall be paid by Vendor.  All risk of loss, damage in transfer, or delay in delivery shall remain with Vendor until delivery to and acceptance by Boscov's, except where transportation is provided by Boscov's own vehicles, and then risk of loss, damage or delay shall shift to Boscov's upon completion of loading of Boscov's vehicle.  Vendor shall prepare all goods for shipment so as to secure the lowest transportation rates consistent with timely delivery.  Boscov's has the right to specify carrier and routing. Vendor shall mark the identification number of this Purchase Order and enclose or transmit electronically a packing slip showing the order number and quantity in each container or other receptacle.  If not accompanied by a packing slip, Boscov's count and weight shall be conclusive Vendor shall not make a commitment for materials or production arrangements to fulfill this Purchase Order in excess of the amount or in advance of the time necessary to meet Boscov's delivery schedule.  Transportation costs on goods on back order shall be paid only at the rates which would have been applicable had the complete order been shipped at one time

4.    OVERSHIPMENTS; DELIVERIES IN ADVANCE OF SCHEDULE: Overshipments exceeding five percent (5%) of the quantity ordered or $750.00 in amount may be accepted by Boscov's upon the terms and conditions set forth herein.  Goods delivered or services offered in advance of schedule without authorization from Boscov's may, at Boscov's option: (a) be returned to Vendor at Vendor's sole risk and expense; (b) be accepted by Boscov's with payment withheld by Boscov's until the scheduled date; or (c) stored at Vendor's sole risk and expense, until the scheduled delivery date.

2

5.    PAYMENT TERMS; SET-OFF: Payment shall be as set forth in this Purchase Order. Eligibility for prompt payment discounts shall be computed from the date of delivery and/or accepted performance, or the receipt by Boscov's of a correct invoice, whichever is later. Boscov's shall be entitled at all times to set off any amount owing at any time from Vendor, or any affiliated company of Vendor, to Boscov's, or any affiliated company of Boscov's, against any amounts payable at any time by Boscov's.

6.    NO SUBSTITUTION OF MATERIALS: No change in the goods or services ordered, or their method of production, including substitutions or changes in materials, equipment, processing, or production location, shall be made by Vendor or any approved subcontractor without the prior consent of Boscov's which shall be in writing or commercially accepted electronic format.

7.    WARRANTIES: Vendor represents and warrants that: (a) it is the sole owner of any goods to be sold under this Purchase Order and that it has the unrestricted right to convey marketable title free and clear of all liens and encumbrances; (b) any goods delivered or services performed will conform to this Purchase Order and any description, specification, drawing or sample relating to such goods or services that has become part of the agreement of the parties; (c) any goods shall be merchantable and fit for the use intended by Boscov's, or by the consumers who will purchase them, and that any goods or services shall be free of all defects in design, material and workmanship, and shall be in good working condition; (d) all goods shall be manufactured in accordance with good manufacturing practices, and (e) all goods and/or services shall conform to and be furnished in accordance with all applicable Federal, state and local law, rules and regulations. These warranties shall run to Boscov's, its successors, assigns, and customers, and the users of its products, and shall survive any delivery, inspection, testing, acceptance or payment by Boscov's, and the termination of this Purchase Order for any reason. Vendor acknowledges that it is an expert in producing and supplying the goods and/or services to be purchased pursuant to this Purchase Order, and notwithstanding Boscov's acceptance of specifications, samples, test data and the goods and/or service, Boscov's may rely on Vendor as an expert.

8.    INSPECTION, REJECTION AND RETURN OF GOODS: All goods and services are subject to Boscov's testing, inspection and approval, notwithstanding prior payment by Boscov's. Goods may be inspected at Boscov's destination or Vendor's plant or warehouse. Boscov's reserves the right, in addition to any other rights which it may have at law, at equity or under this Purchase Order, to reject and refuse acceptance of all or a portion of such goods or services which are not in conformity with Vendor's warranties as determined by Boscov's. Boscov's shall have the right to return to Vendor all or a portion of such non-conforming goods at Vendor's sole risk and expense, for full credit or refund, or require that Vendor, at its sole risk and expense, correct or replace such goods or services with conforming goods or services within such time as Boscov's may require, provided, however, that such corrected or rejected goods or services shall not be corrected or replaced by Vendor without written authorization from Boscov's. If Vendor fails to correct or replace any nonconforming goods or services promptly after notification and authorization from Boscov's, Boscov's may correct or replace such goods or services and charge Vendor therefor, equitably adjust the order price for such goods or services or set-off the cost hereunder, at the sole discretion of Boscov's. Any goods or services corrected, replaced or repaired by Vendor shall be subject to the warranties and other terms of this Purchase Order. In the event of rejection by Boscov's of all or a portion of the goods or services, Boscov's may charge to Vendor and set-off against any payments due Vendor all expense of unpacking, examining, repacking, storing and shipping any goods rejected. Boscov's failure to inspect and accept or reject any goods or services shall not relieve Vendor from responsibility for nonconforming goods nor for latent defects in any goods, whether inspected or not, nor for fraud or such gross mistakes as amount to fraud, nor shall anything herein relieve Vendor from the obligation to inspect and test the goods or services covered by this Purchase Order in accordance with good commercial practices and Boscov's requirements and specifications, nor impose any liability upon Boscov's for such failure or defects. Vendor shall maintain inspection and test records pertaining to such goods and services for a period of two (2) years after delivery of such goods or completion of such services or as otherwise specified by Boscov's and copies thereof shall be made available to Boscov's at any time upon request and without charge. Such records shall include the time and the manner in which, and the person by whom, the goods or services have been inspect and tested and the result of such inspections and tests.

9.    TERMINATION AND REMEDIES: Boscov's may terminate all or any

3

part of this Purchase Order at any time or times by written notice to Vendor: (a) if Vendor fails to observe or comply with any covenants, terms, conditions or warranties contained in this Purchase Order; (b) if Vendor, in Boscov's opinion, fails to make progress so as to endanger performance or shipment in accordance with this Purchase Order or Boscov's has other reasonable grounds to believe performance by Vendor in accordance with its obligations is unlikely or endangered; (c) in the event of any proceeding by or against Vendor in bankruptcy or insolvency, the appointment of a receiver or trustee, or an assignment for the benefit of creditors is made by Vendor; or (d) at any time for Boscov's sole convenience. Upon termination, Boscov's may produce or purchase or otherwise acquire the goods or services ordered under this Purchase Order elsewhere on such terms or in such manner as Boscov's may deem appropriate, and Vendor shall be liable to Boscov's for any excess cost or other expenses incurred by Boscov's. In addition, Boscov's shall have all other rights and remedies provided by law, at equity and under this Purchase Order, and all of Boscov's rights and remedies shall be cumulative and none shall be considered exclusive. Upon termination, Boscov's only responsibility to Vendor shall be to pay (x) the purchase price for goods previously made, delivered to, inspected and accepted by Boscov's and services performed and accepted in accordance with the terms of this Purchase Order before the date of receipt by Vendor of the termination notice, and (y) in case of termination by Boscov's for convenience, (i) an amount equal to Vendor's out-of-pocket costs incurred and irrevocable financial commitments made in order to perform this Purchase Order, plus (ii) a cancellation charge of 15% of such amounts. Any claim under this clause (y) that is not presented to Boscov's within thirty (30) days of notice of cancellation, accompanied by reasonable documentation and calculation of all such charges, shall be waived.

10.    INFRINGEMENT OF PROPRIETARY RIGHTS: Vendor represents and warrants that the sale or use by Boscov's of goods or services provided by Vendor will not infringe any United States or foreign patent, copyright, trademark, industrial design right or other proprietary right. Vendor shall indemnify, defend and hold Boscov's, its successors, assigns, shareholders, officers, directors, employees, agents, customers and those persons selling or using any of Boscov's products harmless from and against any damage, liability, claims, loss, costs, expenses and fees Including reasonable attorneys' fees) (collectively, "Losses") which may be incurred on account of infringement or alleged infringement of any such proprietary right by the goods or use of the goods supplied under this Purchase Order. Vendor shall reimburse Boscov's on an on-going, periodic basis for all fees, costs and expenses incurred by Boscov's promptly after submission of statements of expenses of Boscov's during the pendency of any such proceeding. In addition to all other rights and remedies Boscov's has at law, at equity or under this Purchase Order, in the event Boscov's, its customers or anyone selling or using Boscov's products are enjoined from the use, sale or other disposition of the goods, conditionally or otherwise, Vendor shall, at no additional cost to Boscov's, repurchase the goods at the purchase price and/or Boscov's products at their purchase price, and repay all costs of all shipments of such goods and products incurred by Boscov's.

11.    COMPLIANCE WITH LAWS AND EQUAL OPPORTUNITY: Vendor shall comply with all applicable Federal, state and local laws, rules and regulations relating to the goods and/or services to be furnished hereunder, including, but not limited to, the Federal Insecticide, Fungicide and Rodenticide Act, the Federal Fair Packaging and Labeling Act, the Federal Hazardous Substances Act, the Federal Toxic Substances Control Act, the Fair Labor Standards Act of 1938, the Wool Products Labeling Act of 1939 and the Occupational Safety and Health Act of 1970, all as amended from time to time, and shall furnish certificates of compliance whenever requested by Boscov's. Boscov's serves from time to time as a contractor for the United States Government. Accordingly, Vendor shall comply with all applicable Federal laws, rules and regulations applicable to subcontractor's of government contractors including Section 202 of Executive Order 11246, as amended by Executive Order 11375, the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Rehabilitation Act of 1973, as amended, and those governing contracts with business concerns operating in areas of surplus labor (48 C.F.R. Part 20), with women owned business concerns (Executive Order 12138) and with small and disadvantaged business concerns (15 U.S.C. 637), all as amended from time to time, and shall furnish certificates of compliance whenever requested by Boscov's. Contract clauses required by the Government in such circumstances, and all rules and regulations promulgated under the specific acts cited, are incorporated into this Purchase Order by reference.

12.    RECALL OF GOODS: If Vendor becomes aware that any ingredient, material, part or component in the goods is or may become harmful to persons or property, or that the design or construction of the goods or services is defective in any manner which is or

4

may become harmful to persons or property, or if Vendor otherwise breaches any of its warranties to Boscov's hereunder, Vendor shall immediately give notice thereof, including all relevant information with respect thereto to Boscov's, and Vendor shall indemnify, defend and hold Boscov's, its successors, assigns, shareholders, officers, directors, employees, agents, customers and those selling or using its products, harmless from and against any and all Losses paid or incurred by them arising out of or relating or incidental to such goods or services provided by Vendor, including, without limitation, any costs associated with recalling products developed, manufactured, or created by Boscov's with the aid of such goods or services. Should Boscov's, either voluntarily or involuntarily, initiate a recall of such products, or if a government or agency shall take action with respect to them, Vendor shall assist and cooperate with Boscov's in all respects with said recall, including, but not limited to, developing a recall strategy for the products and working with Boscov's and any applicable governmental agency in monitoring Boscov's recall operating and in preparing and furnishing such reports, records or other such information as is necessary in connection therewith, and Vendor agrees to pay all costs associated with such recall.

13.    GENERAL INDEMNIFICATION:  Vendor shall indemnify, defend and hold Boscov's, its successors, assigns, shareholders, officers, directors, employees, agents, customers and those persons selling or using any of Boscov's products, and any affiliated company of Boscov's, its shareholders, officers, directors, employees, agent and customers and agents, harmless from and against any and all Losses arising out of or relating or incidental to any breach by Vendor of the terms, covenants, warranties and conditions of this Purchase Order, or any act or failure to act by Vendor or its agents, representatives or employees in the performance of this Purchase Order, including, but not limited to:

(a)    Death or injury to persons or damage to property, by whomsoever suffered, claimed to have resulted from any alleged defect in the goods or services, or the performance by Vendor of work or services pursuant to this Purchase Order, or the work or performance of services by Vendor's agents, representatives or employees, on the premises of Boscov's or one of its customers or suppliers, or from the failure of the goods to comply with any applicable sample or specification or with the express or implied warranties given by Vendor, its agents, representatives or employees, and

(b)    Losses arising out of the alleged violation by Vendor in the manufacture, processing, storage or sale of the goods, or in the performance by Vendor under this Purchase Order of any work or services pursuant to this Purchase Order, of any Federal, state or local law, statute, ordinance or administrative order, rule, regulation or standard.

Boscov's shall have the right to employ counsel separate from counsel employed by Vendor in any such proceeding for which Boscov's may be indemnified by Vendor under this Purchase Order and to participate in the defense thereof, and the expense of such counsel employed by Boscov's shall be borne by Vendor.  Vendor shall reimburse Boscov's on an on-going, periodic basis for all fees, costs and expenses incurred by Boscov's promptly after submission of statements of expenses of Boscov's during the pendency of any such proceeding.

14.    INSURANCE:  Vendor shall carry the following insurance with an insurance company or companies rated "A" by Bests (or otherwise acceptable to Boscov's), and shall furnish promptly to Boscov's an insurance carrier certificate evidencing such coverage and naming Boscov's as an additional insured:  workman's compensation insurance (including occupational disease) with statutory limits; employer's liability insurance with limits of $1,000,000, and public liability insurance with broad form endorsement (including products liability, completed operations, contractors liability and protective liability) and automobile liability insurance including non-owned automobile liability) each with limits for bodily injury of $1,000,000 per person and $1,000,000 per occurrence and for property damage of $1,000,000. Said certificate must set forth the amount of coverage, policy, number, date of expiration, and provide that Boscov's shall be given at least sixty (60) days' written notice prior to an expiration, termination, non-renewal or material change in coverage unless under any applicable laws of any state a shorter time period for notice is required, in which case such time period shall apply.  All liability policies shall be written on an "occurrence" basis.  If Vendor is self-insured and registration with the state is required to evidence particular coverage, the certificate of the appropriate state agency of the state in which said work is to be performed must be furnished directly to Boscov's by such state agency.

15.    ADVERTISING, NONDISCLOSURE OF CONTENTS OF

5

AGREEMENT: Except as approved by Boscov's and in conformity with Boscov's policies published from time to time, Vendor shall not (a) in any manner advertise, publicize, publish or otherwise draw attention to the fact that Vendor has furnished or contracted to furnish to Boscov's the goods or services purchased hereby, (b) or disclose any of the details connected with this Purchase Order to any third party except as required for procurement of supplies and services for use in the performance of this Purchase Order, and then only after the substance of this prohibition is inserted in its orders and made binding upon any third party, or (c) in any television or radio appearance or other public occasion or before any audience disclose or refer to Vendor's relationship with Boscov's. The terms of this section shall survive the termination of the Agreement for any reason.

16.    CONFIDENTIAL INFORMATION, BOSCOV'S PROPERTY:

(a)    Drawings, electronic data, designs, samples, order requirements, financial and marketing information and any other information regarding its business supplied by Boscov's shall remain Boscov's property and proprietary information and shall be held in confidence by Vendor. Such information shall not be reproduced, used and/or disclosed to others by Vendor without Boscov's prior written consent, except as required for the performance of this Purchase Order and except to the extent that Vendor is able to establish to Boscov's satisfaction that such information (i) was known by Vendor at the time of disclosure to it by Boscov's, (ii) became known to Vendor after such disclosure to it by Boscov's through a third party as a matter of right and without restriction on disclosure, or (iii) is or has become generally known or available to the public through no act or failure to act on the part of the Vendor. All such information including all reproductions shall be returned to Boscov's immediately upon demand, and otherwise upon completion or performance by Vendor of this Purchase Order or its termination for any reason. The foregoing information shall be at all times labeled as confidential property of Boscov's and treated in a confidential matter by Vendor, and Vendor acknowledges and agrees that disclosure of this information to the industry as a whole would injure Boscov's competitive advantage. The terms of this section shall survive the termination of this Purchase Order for any reason.

17.    CUSTOMER PRIVACY AND DATA SECURITY:

(a)    Vendor (i) has adopted and will maintain policies and procedures designed to protect the privacy and security of Boscov's customers' nonpublic personal information in compliance with applicable law, including without limitation, Title V of the Gramm-Leach-Bliley Act and any rule or regulation promulgated thereunder, any applicable law, rule, or regulation, of the Federal Trade Commission, the Securities and Exchange Commission, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, state regulatory authorities and industry self regulatory organizations (collectively, "Legal Requirements"), related to the privacy and security of Non-Public Personal Information (as defined below); (ii) will cooperate fully with Boscov's, and follow and comply with all reasonable instructions and directions by Boscov's to ensure compliance with the Legal Requirements; and (iii) will not sell, transfer, rent or disclose to any affiliated or non-affiliated third parties or use, except as expressly agreed by Boscov's, any of the Non-Public Personal Information or any data which could reasonably be used to identify a specific named individual ("Individual Data"). Where Boscov's grants permission for release of Individual Data to third parties, Vendor will obtain written assurances from the third party recipients of Individual Data that such third party will provide the option, in any communications generated by, or on behalf of, the third party recipients of Individual Data, for the customer of Boscov's to elect not to receive any further communications from such third party. For purposes of this Purchase Order, "Non-Public Personal Information" shall mean any and all customer information collected and obtained from Boscov's, including, but not limited to name, e-mail, mailing or other address; account number, postal code; telephone number; gender other demographic characteristics; year or date of birth; social security or other tax identification number; educational background; occupation or other socio-economic or financial information; credit situation; pattern of use; nature, subject matter, date or amount paid in any commercial transaction(s); number or identification of viewed/downloaded web site(s); preferences, profile, personal interests or habits; and any other identifying information, regardless of its accuracy or completeness.

(b)    If Vendor (i) receives a complaint concerning a violation or alleged violation of privacy rights or other customer notice with respect to information sharing involving an opt out of sharing any Individual Data between the parties, or (ii) if Vendor becomes aware of a breach of data security involving Individual Data, Vendor shall promptly notify Boscov's.

6

(c)    Vendor understands and agrees that Boscov's will suffer irreparable harm in the event that of a breach of any obligations in this Addendum and that monetary damages will be inadequate to compensate Boscov's for such breach. Accordingly, Vendor agrees that, in the event of a breach or threatened breach of any of the provisions of this Addendum, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity and notwithstanding any dispute resolution provisions in the Agreement, Boscov's will be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach.

18.    **LABOR DISPUTES:** Whenever any actual or potential labor dispute delays or threatens to delay the timely performance of this Purchase Order by Vendor, Vendor shall immediately give notice to Boscov's.

19.    **FUTURE TAXES:** All taxes, assessments, duties or any charge or increase not in effect on the date of this Purchase Order which may, prior to the completion of deliveries of goods or performance of services, be levied by any governmental agency on products, containers for products or services shall be the liability of Vendor without recourse to Boscov's.

20.    **CHANGES:** In addition to Boscov's right to cancel this Purchase Order under Sections 9 or 21, Boscov's reserves the right to make changes within the general scope of this Purchase Order, by any reasonable means, and if requested by Vendor, such changes shall be confirmed in writing by Boscov's. If any such change causes and increase or decrease in the cost of, or time required for, Vendor's performance, the price therefor and/or time required for performance shall be equitably adjusted. Any claim for adjustment hereunder must be asserted in writing within thirty (30) days from the date the change is ordered. Failure on the part of either party to assert its claim within the time provided shall operate as a waiver thereof.

21.    **FORCE MAJEURE:**

(a)    Boscov's reserves the right to defer any shipment under this Purchase Order, cancel or modify this Purchase Order or change any performance dates if Boscov's production is delayed on account of strikes in Boscov's plant or the plants of any of Boscov's suppliers, fire, an act of God, government order or regulation or other conditions beyond Boscov's control.

(b)    Vendor shall not be liable for delays or defaults in delivery due to fire, an act of God, governmental order or other unforeseeable causes beyond its control and without its fault or negligence, provided that Vendor notifies Boscov's within ten (10) days after Vendor first knows of same, time of such notification being of the essence.

22.    **GOVERNING LAW AND CONSENT TO JURISDICTION:** This Purchase Order shall be governed by and construed in accordance with the laws and decisions of the Commonwealth of Pennsylvania, excluding its laws of conflict of laws, and Vendor consents, exclusively to the adjudication of any dispute arising out of this Purchase Order by any federal or state court of competent jurisdiction sitting in Berks County, Pennsylvania and waives any objection to such venue.

23.    **MISCELLANEOUS:** This Purchase Order and any payment or performance due under it may not be assigned, transferred, sublet, subcontracted or delegated, in whole or in part, by Vendor without the prior written consent of Boscov's. Boscov's may assign its rights under this Purchase Order to any of its affiliated companies or to other parties at any time and this Purchase Order shall inure to the benefit to Boscov's, its successors and assigns. No act or failure to act of Boscov's shall constitute a waiver of any provision contained in this Purchase Order and to be valid a waiver of any requirement or obligation under this Purchase Order must be writing and signed by Boscov's. The section headings contained herein are not part of this Purchase Order, but are included solely for the convenience of the parties. The provisions of this Purchase Order are severable, and if any provision is held to be enforceable, any jurisdiction, the remaining provisions will continue in full force and effect.

24.    **INDEPENDENT CONTRACTORS:** Nothing contained in this Purchase Order shall be construed as creating a partnership or joint venture between Boscov's and Vendor, and Vendor shall at all times during the term of this Purchase Order be deemed to

7

be an independent contractor, solely responsible for the manner by and the form in which it fulfills this Purchase Order. To the extent Vendor's obligations under this Purchase Order require the performance of services by Vendor on the premises of Boscov's, Vendor agrees that such services are to be rendered by Vendor as an independent contractor and Vendor shall comply with all of Boscov's safety rules and regulations and shall provide all safeguards and take all necessary precautions to prevent the occurrence of any injury to any person or property during the performance of such services

   25.    NOTICES: Any notices, consents or approvals called for hereunder may be given by telephone, but shall be confirmed in writing to be delivered or sent by telecopier, telex, overnight delivery service or by certified mail, return receipt requested, enclosed in a sealed envelope with first class postage thereon, addressed in the case of Boscov's to its office located at the address set forth on the front side of this document, and in the case of Vendor, at such address as Vendor shall provide Boscov's, or if no address is provided, at Vendor's principal offices. The address of either party may be changed by written notice to the other. Any notice will be deemed to have been received by a party the same date as sent if sent by telecopier or telex, the next day if sent by overnight delivery service and three (3) days from the date sent if given by certified mail, return receipt requested.

   26.    AMENDMENT: This Purchase Order may be amended only by a writing signed by a duly authorized representative of Boscov's.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : <br> : Jointly Administered <br> : Case No. 03-12339 (PJW) <br> : <br> : Chapter 11 |
| PILLOWTEX CORPORATION, <u>et al</u>., | |
| Debtors. | |
| | : |
| PILLOWTEX CORPORATION and <br> FIELDCREST CANNON, INC. | : <br> : <br> : |
| Plaintiffs, | : <br> : C.A. No. 06-615 (GMS) |
| v. | : <br> : |
| BOSCOV'S, INC. and <br> BOSCOV'S DEPARTMENT STORE, LLC, | : <br> : <br> : |
| Defendants. | : <br> : |

## APPENDIX TO DEFENDANTS' OPENING BRIEF IN
## SUPPORT OF THEIR MOTION TO TRANSFER VENUE

STEVENS & LEE, P.C.

Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 654-5180
Telecopier: (302) 654-5181
E-mail: jg@stevenslee.com
        tgw@stevenslee.com

- and -

Steven J. Adams, Esquire
(Member of PA Bar)
111 N. Sixth Street
P.O. Box 679
Telephone: (610) 478-2133
Telecopier: (610) 988-0841
E-mail: sja@stevenslee.com

Dated: October 18, 2006     *Attorneys for Boscov's, Inc. and*
                            *Boscov's Department Store, LLC*

SL1 673454v1/001857.00080

**INDEX**

*In re Omna Medical Partners, Inc.,*
   2000 Bankr. LEXIS 1317, *14 (Bankr. D. Del. 2000)...... Tab One

*In re Safety Kleen,*
   2001 Bankr. LEXIS 1296 (Bankr. D. Del. 2001).......... Tab Two

*Internal Revenue Service v. CM Holdings, Inc.,*
   1999 U.S. Dist. LEXIS 10054 (D. Del. 1999) ........ Tab Three

SL1 673454v1/001857.00080

# TAB 1

*2000 Bankr. LEXIS 1317, \*; 37 Bankr. Ct. Dec. 34*

IN RE: **OMNA MEDICAL PARTNERS,** INC., et al., Debtors. **OMNA MEDICAL PARTNERS,** INC., Plaintiff, v. CARUS HEALTHCARE, P.A. et al., Defendants.

CHAPTER 11, Case No. 00-1493 (MFW) through 00-1508 (MFW) (Jointly Administered Under Case No. 00-1493 (MFW)), Adv. No. A00-439 & A00-550

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2000 Bankr. LEXIS 1317; 37 Bankr. Ct. Dec. 34

June 12, 2000, Decided

**DISPOSITION: [\*1]** Motion to abstain GRANTED; Order dated April 5, 2000, as previously extended by agreement of the parties VACATED; Automatic stay MODIFIED to allow the parties to proceed with the Texas state litigation.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor brought two adversary proceedings to extend the automatic stay to enjoin a suit commenced in state court by defendants, creditor and two of its member doctors, against debtor and its officers and/or directors, and asserting a breach of a management agreement. Defendants moved for abstention under 28 U.S.C.S. § 1334(c), dismissal, or transfer of venue. Debtor asserted the actions were core matters.

**OVERVIEW:** In debtor's adversary proceedings to extend the automatic stay to enjoin a suit commenced in state court by defendants, creditor and two of its member doctors, against debtor and its principals, and asserting a breach of a management agreement, defendants moved for abstention under 28 U.S.C.S. § 1334(c), dismissal, or transfer of venue. Debtor asserted the actions were core matters. The court agreed the matters were core proceedings, thus, mandatory abstention was not warranted, but discretionary abstention was granted. Efficient administration of the estate would not be disrupted by litigating issues in state court. The agreement was terminated pre-bankruptcy by debtor; it was not executory. While debtor characterized the issues as turnover under 11 U.S.C.S. § 542, enforcement of the stay and rights in an executory contract under 11 U.S.C.S. § 365, the issues were contract issues, governed by state law. There were no unique bankruptcy issues that needed to be decided. State court had jurisdiction over all parties and could determine the rights under the agreement. Prior injunction against individual defendants was vacated. Relief from stay was granted to permit state litigation.

**OUTCOME:** Finding that discretionary was warranted, the court granted the motion. Although both adversaries were core matters, the issues were simply contract interpretation issues. State court had jurisdiction over all the parties. Prior injunction was vacated and relief from the stay was granted to allow the state litigation to proceed.

**CORE TERMS:** abstention, automatic stay, accounts receivable, terminated, state law, mandatory, doctor, venue, efficient administration, post-petition, turnover, litigate, abstain, pre-petition, forum selection clause, bankruptcy case, public policy, presumptively, discretionary, nondebtor, unsettled, modified, non-core, profound, bankruptcy proceeding, executory contract, bankruptcy estate, reorganization, collateral, asserting

**LexisNexis(R) Headnotes**

Bankruptcy Law > Case Administration > Commencement > Abstention

Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings
Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings
*HN1* Abstention by the bankruptcy court is mandatory under 28 U.S.C.S. § 1334(c) if the matter is non-core and the proceeding is commenced and can be timely adjudicated in a state court.

Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings
Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Exclusive Jurisdiction
*HN2* The bankruptcy court has exclusive jurisdiction over property of the estate, wherever located. 28 U.S.C.S. § 1334(e). This also vests the bankruptcy court with jurisdiction to determine what is property of the estate and to decide competing interests in property which is alleged to be property of the estate.

Bankruptcy Law > Case Administration > Commencement > Abstention
Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings
Civil Procedure > Federal & State Interrelationships > Abstention
*HN3* Mandatory abstention by the bankruptcy court does not apply to core matters.

Bankruptcy Law > Case Administration > Commencement > Abstention
Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings
Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview
*HN4* Bankruptcy courts have identified 12 factors relevant to an abstention decision under 28 U.S.C.S. § 1334(c)(1): (1) the effect or lack thereof on the efficient administration of the estate; (2) extent to which state law issues predominate over bankruptcy issues; (3) difficulty or unsettled nature of applicable state law; (4) presence of a related proceeding in state court or other non-bankruptcy court; (5) jurisdictional basis, if any, other than 28 U.S.C.S. § 1334; (6) degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) substance rather than the form of an asserted core proceeding; (8) feasibility of severing state law claims from core bankruptcy matters to allow judgments in state court with enforcement left to the bankruptcy court; (9) burden of the court's docket; (10) the likelihood that filing the proceeding in bankruptcy court involves forum shopping by a party; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of nondebtor parties.

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > Claims Against Debtors
*HN5* It is fundamentally unfair to allow a debtor to proceed with state court litigation, but not to allow the defendants to proceed with related litigation.

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Appeals
Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction
*HN6* Permitting a debtor to proceed with its appeal while an appeal of the same case by a creditor is stayed would be unfair.

Civil Procedure > Venue > Federal Venue Transfers > General Overview
Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses
*HN7* Forum selection clauses are presumptively valid and enforceable, absent compelling public policy considerations or serious inconvenience to the parties.

**COUNSEL:** Norman L. Pernick, Esquire, J. Kate Stickles, Esquire, SAUL EWING REMICK & SAUL LLP, Wilmington, DE, for Omna Medical Partners, Inc.

Jeff J. Marwil, Esquire, Mark K. Thomas, Esquire, Dawn M. Canty, Esquire, KATTEN MUCHIN ZAVIS, Chicago, IL, for Omna Medical Partners, Inc.

Laura Davis Jones, Esquire, Bruce Grohsgal, Esquire, PACHULSKI STANG ZIEHL YOUNG & JONES, Wilmington, DE, for Official Committee of Unsecured Creditors.

Michael S. Fox, Esquire, Adam Friedman, Esquire, TRAUB, BONACQUIST & FOX, LLP, New York, NY, for Official Committee of Unsecured Creditors.

Anthony W. Clark, Esquire, SKADDEN ARPS SLATE MEAGHER & FLOM, LLP, Wilmington, DE, for Carus Healthcare, P.A.

WINSTEAD SECHREST & MINICK, P.C., Dallas, TX, for Carus Healthcare, P.A.

John D. McLaughlin, Jr., Esquire, Daniel K. Astin, Esquire, Office of U.S. Trustee, Philadelphia, PA.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINION BY:** Mary F. Walrath

**OPINION: OPINION** n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

Before the Court is the Motion of Carus Healthcare, P.A. and certain doctors associated with it (collectively "Carus" or "the Defendants") for abstention, dismissal, or transfer of venue of two adversary actions brought against the Defendants by OMNA Medical Partners, Inc. ("the Debtor"). The First Adversary Proceeding was commenced by the Debtor seeking to extend the automatic stay in a suit commenced in Texas by Carus and two of its member doctors against the Debtor and five of its present and former officers and/or directors ("the Carus Texas litigation"). The Second Adversary Proceeding was instituted by the Debtor against the Defendants asserting that the Defendants have breached the Management Services Agreement ("the MSA") executed pre-petition by the parties. For the reasons set forth below, we grant the Motion.

I. BACKGROUND FACTS

Prior to the filing of its chapter 11 case on March 24, 2000, the Debtor and Carus were parties to the MSA which was effective November 1, 1997. A dispute arose which resulted in the Debtor giving notice, on March 7, 2000, that Carus was in breach of the MSA, that the MSA was terminated and that the Debtor would seek to enforce **[*3]** its termination rights under the MSA. The Debtor subsequently commenced an action in Texas to foreclose on collateral in which the Debtor asserted an interest pursuant to the MSA ("the OMNA Texas litigation"). Carus responded by filing the Carus Texas litigation against the Debtor and five of its current and former officers and directors seeking to enjoin the foreclosure. An ex parte temporary restraining order was entered on March 17, 2000, in the Carus Texas litigation.

Upon the expiration of the Texas TRO, the Debtor foreclosed on the collateral. The Texas court has stayed any further proceedings in the Carus Texas litigation in light of the filing of the Debtor's bankruptcy proceeding on March 24, 2000.

On the day it filed its bankruptcy proceeding, the Debtor also commenced the First Adversary Proceeding against Carus and two of the doctor Defendants seeking to extend the automatic stay to cover the directors and officers named in the Carus Texas litigation. An order was entered granting that relief on April 5, 2000, which was extended by agreement of the parties first until May 15, 2000, and then until a decision can be rendered on the instant Motion.

On April 20, 2000, the **[*4]** Debtor commenced the Second Adversary Proceeding by which it sought to enforce its contractual rights under the MSA. In that proceeding the Debtor sought turnover of the accounts receivable pursuant to section 542 of the Bankruptcy Code, enforcement of its rights under the MSA pursuant to section 365 of the Bankruptcy Code and enforcement of the automatic stay under section 362 of the Bankruptcy Code by enjoining Carus's interference with the accounts receivable and other property of the Debtor.

II. DISCUSSION

Carus' Motion seeks mandatory or discretionary abstention, dismissal pursuant to Fed. R. Civ. P. 12(b)(3) or (6) or, alternatively, transfer of venue of the First and Second Adversary Proceedings to the Texas court for resolution in connection with the pending Texas litigation. The Debtor opposes the Motion.

A. Mandatory Abstention

*HN1* Abstention by the Bankruptcy Court is mandatory under 28 U.S.C. § 1334(c) if the matter is non-core and the proceeding is commenced and can be timely adjudicated in a state court. Carus asserts that the Adversary Proceedings are non-core as the dispute is simply a contract issue, governed by state law. Carus **[*5]** notes that the issues which the Debtor seeks to litigate in the Second Adversary are essentially the same issues that Carus raised in its Texas litigation: the respective rights of the parties under the MSA.

The Debtor disagrees asserting that the First Adversary Proceeding is clearly core, since it could not have been brought in the absence of the bankruptcy filing. That proceeding seeks to extend the automatic stay to the officers and directors under section 105 of the Bankruptcy Code. We agree with the Debtor that the First Adversary is core.

The Debtor asserts that the Second Adversary is also core because it seeks a turnover of property of the estate (the accounts receivable) under section 542 of the Bankruptcy Code. The Debtor further emphasizes that its entitlement to the accounts receivable is derived from language in the MSA which is identical to language in all its other contracts and, therefore, a decision in this adversary could have profound effects on its bankruptcy case generally.

We agree with the Debtor that *HN2* this Court has exclusive jurisdiction over property of the estate, wherever located. 28 U.S.C. § 1334(e). This also vests the Bankruptcy **[*6]** Court with jurisdiction to determine what is property of the estate and to decide competing interests in property which is alleged to be property of the estate. See, e.g., In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 267 (3d Cir. 1991)(determination of extent or validity of lien on property of the estate is core); Pension Benefit Guaranty Corp. v. Continental Airlines, Inc., 138 B.R. 442, 445 (D. Del. 1992)(determination of what is property of the estate is core); In re Jartran, Inc., 87 B.R. 525, 527 (N.D. Ill. 1988)(an action to determine the extent, nature, and priority of a creditor's claim is core).

The Second Adversary Proceeding does raise issues regarding the ownership of the accounts

receivable and other property which the Debtor asserts is property of the estate. Thus, we conclude that it is core. To the extent the First and Second Adversary Proceedings raise core issues, mandatory abstention is not warranted. See, e.g., In re Ben Cooper, Inc., 924 F.2d 36, 38 (2d Cir.), cert. denied, 500 U.S. 928, 114 L. Ed. 2d 126, 111 S. Ct. 2041 (1991) (mandatory *HN3*abstention does not apply to core [*7] matters).

B. Discretionary Abstention

Carus asserts alternatively that the doctrine of discretionary abstention under 28 U.S.C. § 1334(c)(1) militates in favor of abstaining from considering the issues raised in the Adversary Proceedings.

*HN4*Courts have previously identified twelve factors relevant to the abstention decision:

> In determining whether abstention is appropriate under section 1334(c)(1), courts consider the following factors: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with the enforcement [*8] left to the bankruptcy court; (9) the burden of the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of nondebtor parties.

In re Continental Airlines, Inc., 156 B.R. 441, 443 (Bankr. D. Del. 1993); In re Total Technical Services, Inc., 142 B.R. 96, 100-01 (Bankr. D. Del. 1992)(citations omitted).

Applying those factors to the issues raised by the Second Adversary Proceeding, we find that most favor abstention. First, the efficient administration of the bankruptcy estate will not be disrupted by litigating these issues in the state courts. The Debtor asserts that the issues raised by the Carus Texas litigation are common to issues which may be raised by other practice groups since the MSAs are virtually identical. Thus, the Debtor argues that a decision in the Carus Texas litigation could have profound effects on the Debtor's successful reorganization which is dependent on the Debtor's rights under the MSAs. Therefore, the Debtor argues that the efficient administration [*9] of the bankruptcy estate mandates that these issues be litigated in this Court.

However, there is a significant difference between the Carus MSA and the others which this Court will be called upon to adjudicate: the Carus agreement was terminated pre-bankruptcy (by the Debtor). Thus, it is not an executory contract like the other MSAs. Nor does the Debtor contemplate reorganizing around its relationship with the Carus Group, as it does with respect to the other doctor groups with whom it still has an existing contractual relationship. The Carus litigation involves only what the respective rights of the parties are under the now-terminated MSA. In contrast, the other MSAs will require consideration of whether they

should be assumed or rejected under section 365, as well as their impact on confirmation of the Debtor's Plan.

State law issues obviously dominate the subject matter of the Texas litigation. While the Debtor seeks to characterize the issues as bankruptcy issues (turnover under section 542 of the Bankruptcy Code, enforcement of the automatic stay and rights in an executory contract under section 365), the issues are simply contract interpretation issues and are, by the terms **[*10]** of the contract, governed by Texas law. Thus, there are no uniquely bankruptcy issues that need be decided in this Court. n2 While we are not aware that there are any unsettled or difficult state law questions involved, we believe that the state court is the better forum to make that determination, if there are.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 This is in contrast to the non-terminated MSAs because the parties' rights under them may be modified by the Bankruptcy Code. See 11 U.S.C. § 365.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

There are state court proceedings already commenced, one by the Debtor itself which it has continued to prosecute post-petition. While the Carus Texas litigation has not significantly progressed, because of the pendency of the automatic stay, the OMNA Texas litigation has. *HN5* It is fundamentally unfair to allow the Debtor to proceed with state court litigation, but not to allow the Defendants to proceed with related litigation. See, e.g., Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446 (3d Cir. 1982) **[*11]** (*HN6* permitting debtor to proceed with its appeal while appeal of the same case by creditor is stayed would be unfair).

The Debtor asserts that jurisdiction lies in this Court because this is a proceeding to determine the extent or validity of an interest of Carus in property of the Debtor. While it is true that we have jurisdiction, the Texas court also has jurisdiction. Further, the Texas court apparently has jurisdiction over all the parties to the litigation, debtor and non-debtor. Since the Texas court can determine the rights of all parties under the allegedly terminated MSA, we believe it is appropriate to allow it to do so. To the extent that the Texas litigation results in a determination that the Debtor is the owner of the disputed accounts receivable and other property, the Texas court has available process for enforcement of those rights. This will allow a speedier vindication of the Debtor's rights than the bifurcated process of litigation in this Court and enforcement through state process. (This is, no doubt, why the Debtor sought, even post-petition, to enforce its rights in the property in the Texas state court.) Conversely, to the extent that the Texas litigation results **[*12]** in the determination of a claim by Carus against the Debtor, any enforcement of that claim will still be subject to the automatic stay and to distribution in these bankruptcy proceedings in accordance with the Bankruptcy Code. Thus, it is feasible (and in fact preferable) to allow the state court to conclude the cases before it, leaving for this Court only a determination as to the distribution, if any, to which Carus is entitled under the Code.

While we make no determination that the filing of either Adversary Proceeding was an attempt to forum shop by the Debtor, it is significant that the Debtor agreed that all issues under the MSA would be determined in the Texas courts. (See MSA at § 15.1.) *HN7* Forum selection clauses are presumptively valid and enforceable, absent compelling public policy considerations or serious inconvenience to the parties. See, e.g., M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); In re Diaz Contracting, Inc., 817 F.2d 1047 (3d Cir. 1987); Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd., 709

F.2d 190, 202 (3d Cir.), cert. denied, 464 U.S. 938, 78 L. Ed. 2d 315, 104 S. Ct. 349 (1983). **[*13]** Like the instant case, both Diaz and Coastal Steel involved adversary proceedings brought by a debtor in possession to collect damages for breach of a pre-petition contract. Diaz, 817 F.2d at 1049 n.1; Coastal Steel, 709 F.2d at 193. In the Diaz case the debtor argued unsuccessfully that the forum selection clause should not be enforced because of the bankruptcy law policy to consolidate all issues relating to a debtor's property in one forum and the significant expense if the debtor, which was in perilous financial straits, was required to litigate the issue in a different forum. Diaz, 817 F.2d at 1051. Similarly, we find the Debtor's arguments here unpersuasive.

Since the Debtor has already availed itself of the Texas court on this issue, it cannot contend that Texas is not a convenient forum. The Debtor chose to enforce its rights under the terminated MSA in the Texas court both pre-petition and post-petition. The Debtor should not legitimately have expected that it could use the Texas court to enforce its rights under the terminated agreement, while depriving the Defendants of the concomitant right to enforce their **[*14]** rights under that same agreement in the same court. Nor, for the reasons stated above, does the public policy behind the Bankruptcy Code mandate that these issues be tried here. They are not so central to this reorganization as to overcome the presumptively valid forum selection clause to which the parties agreed.

The right to a jury is not implicated. The Texas litigation does involve nondebtor parties, the former and current officers and directors of the Debtor, as well as, obviously the Defendants. While we entered a preliminary injunction of the action against the officers and directors in the First Adversary Proceeding, it is appropriate to vacate that Order now to permit all the related actions in Texas to proceed. We will also grant relief from the stay, to the Defendants as well as the Debtor, to permit the parties to fully litigate the issues raised in the state court proceedings to the extent articulated above. See, St. Croix, 682 F.2d at 449, n.2.

C. Transfer of Venue

The Defendants alternatively request dismissal or transfer of venue of the Adversary Proceedings pursuant to 28 U.S.C. § 1404(a) or § 1412. Because we have determined **[*15]** to abstain from deciding the Adversary Proceedings, it is not necessary for us to decide these arguments.

III. CONCLUSION

For the foregoing reasons, the Defendant's Motion is granted in part and we will abstain from hearing the First and Second Adversary Proceedings.

An appropriate order is attached.

BY THE COURT:

Dated: June 12, 2000

Mary F. Walrath

United States Bankruptcy Judge

**ORDER**

AND NOW, this **12TH** day of **JUNE, 2000**, upon consideration of the Motion of Carus Healthcare, P.A. ("Carus") and the other Defendants for abstention, dismissal, or transfer of venue of the above two adversary proceedings and the Response of the Debtor thereto, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion to abstain is **GRANTED**; and it is further

**ORDERED** that the Order dated April 5, 2000, as previously extended by agreement of the parties is hereby **VACATED**; and it is further

**ORDERED** that the automatic stay is hereby **MODIFIED** to allow the parties to proceed with the Texas state litigation, provided however, that the Defendants shall not be permitted to enforce any money judgment **[*16]** they may obtain against the Debtor or any judgment they may obtain against property of the Debtor's estate without further Order of this Court.

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

Source: Legal > / . . . / > **Federal & State Cases, Combined** ⓘ
Terms: **name(omna medical partners)** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, October 16, 2006 - 9:49 AM EDT

* Signal Legend:
 - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®   About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# TAB 2

Service: **Get by LEXSEE®**
Citation: **2001 bankr lexis 1296**

*2001 Bankr. LEXIS 1296, \**

IN RE: SAFETY-KLEEN CORPORATION, Debtor. SAFETY-KLEEN (PINEWOOD), INC., Plaintiff, vs. SUMTER COUNTY, SOUTH CAROLINA, Defendant.

Chapter 11, Case No. 00-02303 (PJW), Jointly Administered, Adv. Proc. No. 00-1984

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2001 Bankr. LEXIS 1296

August 27, 2001, Decided

**DISPOSITION: [\*1]** Motion to transfer venue was granted. Adversary proceeding was transferred to South Carolina.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Debtor waste treatment facility brought an adversary action for a declaratory judgment that it had not breached a consent order or exceeded the waste limit defined in the consent order. Defendant county moved to abstain, or, under 28 U.S.C.S. § 1412, transfer venue to a South Carolina state court or to the United States District Court for the District of South Carolina, where another action arising out of the consent order was pending.

**OVERVIEW:** The court found the debtor was incorporated and headquartered in South Carolina where it operated the hazardous waste facility. The county claims, and the debtor did not dispute, that all files and records related to the litigation that gave rise to, and which spawned from, the consent order were located there. And, the debtor was actively litigating the related matter in the United States District Court for the District of South Carolina. A transfer to the same court would be convenient for both parties. The only two parties were the debtor and the county. The state of incorporation of the debtor's corporate parent, and the location of its shareholders, did not affect the balance of factors favoring transfer. The complaint did not involve any creditors, nor did it adjudicate creditor claims or liabilities. The facility was located in the county. Public policy interests favored transfer. While the debtor could suffer economic harm by an adverse ruling on the merits, a ruling that would shut down the facility, an adverse ruling from the bankruptcy court would be just as detrimental. The case involved complex issues of purely state law.

**OUTCOME:** The county's motion to abstain or in alternative, to transfer venue, was granted. The case was transferred to the United States District Court for the District of South Carolina.

**CORE TERMS:** venue, adversary proceeding, hazardous waste, interested parties, shut down, proximity, transferring, convenience, inconvenience, litigating, declaratory judgment, abstain, state law, headquartered, dramatic, zoning, borders, responsible parties, prior litigation, economic impact, reorganization, transferred, conjunction, landfill, favoring, weighs

**LexisNexis(TM) HEADNOTES - Core Concepts – ✦ Hide Concepts**

📄 Bankruptcy Law > Practice & Proceedings > Adversary Proceedings
📄 Civil Procedure > Venue > Change of Venue in Federal Courts

*HN1* ⚡ A bankruptcy court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C.S. § 1412. Fed. R. Bank. P. 7087. 28 U.S.C.S. § 1412 permits transfer of a case or proceeding under the Bankruptcy Code to a district court for another district, in the interest of justice or for the convenience of the parties. This is a broad and flexible standard which must be applied on a case-by-case basis.

📄 Civil Procedure > Venue > Change of Venue Generally

*HN2* ⚡ The party moving for change of venue bears the burden of proof by a preponderance of the evidence.

📄 Bankruptcy Law > Practice & Proceedings > Venue
📄 Civil Procedure > Venue > Change of Venue Generally

*HN3* ⚡ The ultimate decision to transfer venue lies within the sound discretion of the court. United States Bankruptcy Courts for the District of Delaware generally consider the following four factors when deciding whether to transfer venue: (1) the proximity of the court to the interested parties; (2) the location of the debtor's assets; (3) the efficient and economic administration of the estate; and (4) the relative economic harm to the debtor and other interested parties.

📄 Bankruptcy Law > Practice & Proceedings > Venue
📄 Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN4* ⚡ When a bankruptcy court is deciding whether to transfer venue, location of assets is generally only significant in a single asset real estate case or liquidation.

📄 Bankruptcy Law > Practice & Proceedings > Venue
📄 Bankruptcy Law > Practice & Proceedings > Adversary Proceedings

*HN5* ⚡ When a bankruptcy court is deciding whether to transfer venue, in the context of the economic harm factor, the proper inquiry is on whether the transfer of the litigation, not its outcome, will cause economic harm to the debtor.

**COUNSEL:** For Sumter County, South Carolina: Adam Singer, Cooch and Taylor, Wilmington, DE.

For Sumter County, South Carolina: W. E. Calloway, Robinson, Barton, McCarthy & Calloway, P.A., Columbia, SC.

For Sumter County, South Carolina: Terrell T. Horne, Bryan, Bahnmuller, Goldman & McElveen, Sumter, SC.

For Safety-Kleen Corp., et al., Debtors-in-Possession: David S. Kurtz, J. Gregory St. Clair, Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois.

For Safety-Kleen Corp., et al., Debtors-in-Possession: Gregg M. Galardi, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE.

For Safety-Kleen Corp., et al., Debtors-in-Possession: Stuart H. Newberger, Laurel Pyke Malson, Ellen B. Steen, Adam Gajadharsingh, Crowell & Moring LLP, Washington, D.C.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION: MEMORANDUM OPINION**

Date: August 27, 2001

**WALSH, J.** /s/ Peter J. Walsh

Before the Court is the motion (Doc. # 6) of defendant, Sumter County, South Carolina ("Sumter County") to abstain, or in the alternative, **[*2]** to transfer venue of this adversary proceeding to South Carolina under 28 U.S.C. § 1334(c) and 28 U.S.C. § 1412 respectively. Plaintiff Safety-Kleen (Pinewood), Inc. ("Pinewood") seeks a declaratory judgment that it is in compliance with a consent order pertaining to the regulation, zoning and capacity of Pinewood's hazardous waste disposal facility in Pinewood, South Carolina. For the reasons discussed below, I find that the convenience of the parties and the interest of justice are best served by transferring this case to the United States District Court for the District of South Carolina (Columbia Division)(the "South Carolina District Court") I will accordingly grant Sumter County's motion.

**BACKGROUND**

Pinewood, incorporated and headquartered in South Carolina, operates and co-owns a treatment, storage and disposal facility for hazardous waste (the "Facility"). The Facility is in Pinewood, South Carolina and sits on the headwater shores of Lake Marion. Sumter County is a political subdivision of South Carolina.

Sumter County and Pinewood's predecessor in interest, Laidlaw Environmental Service of South Carolina, Inc., were **[*3]** involved in state court litigation concerning, inter alia, the zoning and hazardous waste capacity of the Facility. The parties resolved the litigation by entering into a Consent Order, Accompanying Agreement, and Memorandum of Agreement on April 25, 1994 ("Consent Order"). The Consent Order establishes the hazardous waste capacity limit at the Facility.

On June 9, 2000, Safety-Kleen, Corporation and its affiliates, including Pinewood, (collectively, the "Debtors"), filed for voluntary chapter 11 relief in this court. At about the same time, the South Carolina Department of Health and Environmental Control ("DHEC") issued two orders directed at the Facility. The first, issued June 9, 2000, required Pinewood to obtain replacement surety bonds by August 28, 2000 or shut down the Facility. The second, issued June 14, 2000, required Pinewood to shut down the Facility by July 14, 2000, based on the DHEC's interpretation of a ruling by the South Carolina Court of Appeals that the Facility had eclipsed its capacity and was no longer able to accept hazardous waste consistent with its existing licensing arrangements.

In response, on July 7, 2000, the Debtors commenced an adversary proceeding **[*4]** against the DHEC and related parties (the "DHEC Defendants") in this court (Adv. No. 00-698) seeking declaratory and injunctive relief to enjoin enforcement of the DHEC's June 9 and June 14 orders. The Debtors simultaneously moved to withdraw the reference of the adversary case to the United States District Court for the District of Delaware (the "Delaware District Court"). On July 10, 2000, the Delaware District Court entered an order temporarily restraining the DHEC Defendants from enforcing the DHEC orders pending a hearing on the Debtors' motion for a preliminary injunction. After issuing the temporary restraining order, and at the DHEC Defendants' request, the Delaware District Court transferred venue of that adversary proceeding to the South Carolina District Court. The case is still pending there.

On June 9, 2000, Pinewood filed an application with the DHEC for expanded landfill hazardous waste capacity at the Facility. Sumter County objected to the expansion request

as a violation of the Consent Order. In response, on November 30, 2000, Pinewood initiated this adversary proceeding seeking a declaratory judgment that it has neither breached the Consent Order nor exceeded the **[*5]** capacity limit defined in the Consent Order.

Sumter County now moves to abstain or transfer venue of this case to either a state court in South Carolina or to the South Carolina District Court. Sumter County argues it has a significant public interest in the operations at the Facility and that the case involves complex issues of purely state law, specifically, the hazardous waste capacity of the Facility. Sumter County also argues the case is substantially related to the prior litigation in South Carolina and that consequently, a transfer of venue will not inconvenience Pinewood because Pinewood is headquartered in South Carolina, operates its only asset in South Carolina, and has South Carolina counsel who is intimately familiar with the litigation surrounding the consent Order and the DHEC rulings.

Pinewood opposes transfer primarily because it fears doing so will adversely impact the efficient and economic administration of its bankruptcy estate. It argues that the DHEC and Sumter County will force the closure of the Facility, which would seriously jeopardize if not prevent Pinewood's restructuring efforts. Although Pinewood essentially concedes that state law predominates this **[*6]** case, Pinewood argues that a shut down of the Facility would cause dramatic economic harm to Pinewood, and that this adversary proceeding should therefor properly be considered by this Court in conjunction with Pinewood's underlying bankruptcy proceeding. Finally, Pinewood maintains that transferring this case to South Carolina imposes a significant inconvenience to Pinewood and interested parties, including the Debtors' stockholders and creditors, most of whom it maintains are located in greater proximity to Delaware.

## DISCUSSION

*HN1*The court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412. Fed.R.Bank.P. 7087. Section 1412 permits transfer of "a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. This is a "broad and flexible standard which must be applied on a case-by-case basis." Gulf States Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod., Corp.), 896 F.2d 1384, 1391 (2d Cir. 1990)

*HN2*The party moving for change of venue **[*7]** bears the burden of proof by a preponderance of the evidence. In re Emerson Radio Corp., 173 B.R. 490, 495 (D. N.J. 1994). *HN3*The ultimate decision to transfer venue lies within the sound discretion of the court. Id. Courts in this district generally consider the following four factors when deciding whether to transfer venue:

1. The proximity of the court to the interested parties;

2. The location of the debtor's assets;

3. The efficient and economic administration of the estate; and

4. The relative economic harm to the debtor and other interested parties.

In re PWS Holding Corp., Bruno's, Inc., et al., 1998 Bankr. LEXIS 549 at *5, Case Nos. 98-212(SLR) through 98-223(SLR) (April 28, 1998) and cases cited therein; Continental Airlines, Inc. v. Chrysler (In re Continental Airlines, Inc.), 133 B.R. 585, 587-88 (Bankr. D. Del. 1991). Accord e.g., I.R.S. v. CM Holdings, Inc., 1999 U.S. Dist. LEXIS 10054, 1999 WL

459754 at *2 - 3 (D. Del. June 10, 1999)(discussing Third Circuit standard); Haworth, Inc. v. Sunarhauserman Ltd., 131 B.R. 359, 362 (Bankr. W.D. Mich. 1991)(including proximity of witnesses **[*8]** as factor); F/S Airlease II, Inc. v. Aerothrust Corp. (In re F/S Airlease II, Inc.), 67 B.R. 428, 432 (Bankr. W.D. Pa. 1986)(including state's interest in having local controversies decided within its borders, enforceability of any judgment rendered, ease of access to necessary proof, and availability of subpoena power for unwilling witnesses as additional factors).

Applying these factors to the record before me, I find that transferring this case to the South Carolina District Court best serves the convenience of the parties and the interest of justice.

The first factor, the proximity of the court to the interested parties, weighs in favor of a transfer. Proximity here is essentially a matter of convenience for the parties which, under the circumstances, I find the most persuasive factor favoring transfer. Pinewood is incorporated and headquartered in South Carolina where it operates a hazardous waste treatment facility. Presumably, the majority of its books and records, the responsible parties, and the relevant witnesses are located in South Carolina. Sumter County claims, and Pinewood does not dispute, that all files and records related to the litigation that **[*9]** gave rise to, and which spawned from, the Consent Order are located there. Furthermore, Pinewood is actively litigating a closely related matter in the South Carolina District Court. It seems to me that transferring this adversary proceeding to the same court will be convenient for both parties. At a minimum, it will not be an inconvenience to either.

I am not persuaded by Pinewood's argument that Delaware has greater proximity to the interested parties in this case based on the location of Pinewood's parent corporation, Safety-Kleen Corp., and its investors and creditors. The only two parties in this adversary proceeding are Pinewood and Sumter County. Thus, neither the state of incorporation of Pinewood's corporate parent, nor the location of its shareholders, should affect the balance of factors favoring transfer.

Likewise, with regard to Pinewood's concern about the convenience of its creditors in litigating this dispute in South Carolina, I note the complaint does not involve Pinewood's creditors nor does it adjudicate creditor claims or liabilities. Pinewood is seeking a declaratory judgment that it is in compliance with a Consent Order that determines capacity for hazardous **[*10]** waste at the Facility. Litigation therefore does not require creditor involvement and I fail to see how a transfer to South Carolina would inconvenience any of Pinewood or Safety-Kleen's creditor constituencies.

The second factor, the location of the debtor's assets, also weighs in favor of transferring venue in this case. Although *HN4*location of assets is generally only significant in a single asset real estate case or liquidation, see, e.g., In re Pic N' Pay Stores, Inc., Case No. 96-182 (PJW) Bench Decision (Bankr. D. Del. Mar. 8, 1996), Pinewood's material asset here is a hazardous waste landfill. Such an operation, with its unique use of real property and attendant impact on surrounding communities, raises local issues not present with a more traditional manufacturing concern that has a more national scope. I am therefore inclined to agree with Sumter County that the location of the Facility within its borders engenders a public policy interest that favors transfer under the circumstances.

Finally, as to the third and fourth factors regarding the economics of administering Pinewood's estate and the relative economic harm to Pinewood and other interested parties, I view them **[*11]** as non-outcome determinative as applied to the facts of this case. It is unlikely that a transfer of venue will have an economic impact on the administration of Pinewood's estate given the case does not involve a claim against the estate or a core bankruptcy matter. The underlying controversy turns on the interpretation of a consent order under state law. Pinewood is already litigating two cases on related matters against the same defendants in that state. It has not proffered any basis for concluding that litigating this

adversary proceeding in South Carolina will cause additional expense, undue economic harm or administrative inconvenience.

Pinewood argues that a transfer to South Carolina will result in dramatic economic harm to Pinewood and other interested parties because the relief it seeks in the adversary proceeding is essential to the continued economic viability of the entire Pinewood corporation. Pinewood argues continued operation of the Facility is necessary for reorganization and that a shut down would mean the end of Pinewood with respect to ownership of the Facility. It concludes a transfer of venue to South Carolina would result in dramatic economic harm because a **[*12]** transfer will result in a shut down of the Facility.

This argument misinterprets *HN5* the economic harm factor. The proper inquiry is on whether the transfer of the litigation, not its outcome, will cause economic harm to Pinewood. Pinewood may suffer economic harm by an adverse ruling on the merits of its case, i.e., a ruling that would shut down the Facility, but an adverse ruling from this Court would be as detrimental to Pinewood's reorganization efforts as one from a court in South Carolina. Absent compelling evidence to the contrary, I am not persuaded by Pinewood's implicit argument that the court in South Carolina will not properly consider the merits of Pinewood's complaint in conjunction with its underlying bankruptcy proceedings. Pinewood presents no basis on which to conclude that a transfer of venue alone will result in a shut down of the Facility.

Pinewood does not dispute that the records, prior litigation material, responsible parties, witnesses and evidence are mostly located in South Carolina. Sumter County, on the other hand, plausibly argues that it will incur extensive travel and lodging expenses if forced to litigate in Delaware, given that its legal, environmental **[*13]** and other professionals with knowledge of the dispute are all located in South Carolina.

**CONCLUSION**

In sum, I find that the convenience of the parties and the interest of justice are best served by transferring venue of this case to the South Carolina District Court. Transfer is appropriate considering the proximity of the South Carolina court to the interested parties, the location of Pinewood's assets in South Carolina, the nominal economic impact of a transfer on the administration of Pinewood's estate, and the lack of relative economic harm to Pinewood. Because I decide this motion under 28 U.S.C. § 1412, I need not address Sumter County's alternative request for abstention under 28 U.S.C. § 1334.

**ORDER**

For the reasons set forth in the Court's Memorandum Opinion of this date, the motion (Doc. # 6) of Sumter County, South Carolina to abstain or in the alternative, to transfer venue, is GRANTED. Adversary Proceeding No. 00-1984, currently pending in this Court, is hereby transferred, pursuant to 28 U.S.C. § 1412, to the United States District Court for the District of South Carolina (Columbia **[*14]** Division).

/s/

Peter J. Walsh

United States Bankruptcy Judge

Date: August 27, 2001

Service:  **Get by LEXSEE®**
Citation:  **2001 bankr lexis 1296**
View:  Full
Date/Time:  Thursday, May 29, 2003 - 6:32 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# TAB 3

1999 U.S. Dist. LEXIS 10054, *

**INTERNAL REVENUE SERVICE,** Plaintiff, v. **CM HOLDINGS,** INC., Defendant.

Civil Action No. 97-695 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1999 U.S. Dist. LEXIS 10054

May 26, 1999, Argued, Wilmington, Delaware
June 10, 1999, Decided

**NOTICE: [\*1]**   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Camelot's motion to change venue denied.

**CASE SUMMARY:**
**PROCEDURAL POSTURE:** Movant sought to transfer venue to the United States District Court in Ohio pursuant to 28 U.S.C.S. §§ 1404(a) and 1412 because that court had a case pending that presented similar issues of law and fact.

**OVERVIEW:** Movant established a life insurance company to provide funding for future liabilities under a self-insured benefit plan. Movant purchased life insurance policies on their employees using loans. Movant deducted the interest payments on an accrual basis and claimed tax deductions for interest payments. Movant filed a voluntary petition in bankruptcy and the Internal Revenue Service (IRS) filed proof of its claim in the bankruptcy court because the tax deductions were not allowed under 26 U.S.C.S. §§ 163 (a) and 264(c)(1). Movant filed a request to change venue pursuant to 28 U.S.C.S. §§ 1404(a) and 1412. The court denied the motion to change venue because transfer of venue would not have made the trial easier, more expeditious, or less expensive. The court gave deference to plaintiff's choice of forum and found there were no significant countervailing factors to support the change of venue because the witnesses were not subject to process by either district, movant filed the bankruptcy claim in Delaware, and the claim arose in Delaware when the IRS filed a proof of claim that disputed defendant's tax deductions.

**OUTCOME:** The court denied movant's request to change venue because there were no significant countervailing factors to support the change of venue, movant filed the bankruptcy claim in Delaware, and the claim arose in Delaware when the Internal Revenue Service filed a proof of claim that disputed defendant's tax deductions.

**CORE TERMS:** convenience, saving, motion to change venue, proof of claim, public interest, transferred, choice of forum, venue, principal place of business, issues of law, inconvenience, transferring, third-party, non-party, reside, oral argument, fora, bankruptcy proceeding, judicial economy, original action, third party, predecessors-in-interest, consolidated, inexpensive, enumerated, transferee, withdrawal, disturbed, mandatory

### LexisNexis(R) Headnotes

Tax Law > Federal Income Tax Computation > Compensation & Welfare Benefits > Life Insurance (IRC sec. 79)
Tax Law > Federal Income Tax Computation > Deductions for Business Expenses > Interest (IRC sec. 163)

*HN1* I.R.C. § 264(d) disallows interest deductions on loans with respect to company owned insurance.

Civil Procedure > Venue > Federal Venue Transfers > General Overview
*HN2* See 28 U.S.C.S. § 1404(a).

Bankruptcy Law > Practice & Proceedings > Venue > Change of Venue
Civil Procedure > Venue > Federal Venue Transfers > General Overview
*HN3* See 28 U.S.C.S. § 1412.

Civil Procedure > Venue > Federal Venue Transfers > General Overview
Civil Procedure > Venue > Individual Defendants
*HN4* The private interests in deciding whether to change venue include: (1) plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses -- but only to extent that the witnesses may actually be unavailable for trial in one of the fora, and (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

Civil Procedure > Venue > General Overview
Civil Procedure > Federal & State Interrelationships > Erie Doctrine
Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview
*HN5* The public interests in deciding whether to change venue include: (1) the enforceability of the judgment, (2) practical considerations that would make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, (5) the public policies of the fora, and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

Civil Procedure > Venue > Federal Venue Transfers > General Overview
Civil Procedure > Venue > Motions to Transfer > Choice of Forum
*HN6* The plaintiff's choice of forum is given substantial weight and will not be disturbed unless other factors weigh substantially in favor of the transfer of venue.

**COUNSEL:** For plaintiff: Carl Schnee, Esquire, United States Attorney, Ellen W. Slights, Esquire, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware.

For plaintiff: Dennis M. Donohue, Esquire, Alan J.J. Swirski, Esquire, Joseph A. Sergi, Esquire, Of Counsel, United States Department of Justice, Washington, D.C.

For defendant: S. David Peress, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware.

For defendant: Michael I. Saltzman, Esq., Of Counsel, White & Case LLP, New York, New York.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINION BY:** Murray M. Schwartz

## OPINION: MEMORANDUM OPINION

Argued: May 26, 1999
Dated: June 10, 1999
Wilmington, Delaware

### SCHWARTZ, Senior District Judge

## I. INTRODUCTION

Camelot Music Holdings, Inc. ("Camelot") filed a motion to change venue asking this action be transferred to the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a) and 1412. Camelot asserts this Court should "in the interest of judicial economy and for the convenience of the parties **[*2]** and third-party witnesses" transfer this case to the United States District Court for the Southern District of Ohio, Eastern Division (the "Ohio Court"). The Ohio Court has pending before it a case captioned, *American Electric Power, Inc. v. United States* (Case No. C2-98-304) (the "AEP case"), which presents similar issues of law and facts.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. For reasons that follow, the Court will deny Camelot's motion to change venue.

## II. FACTS

Camelot, a Delaware corporation with its principal place of business in North Canton, Ohio, owns and operates more than 480 stores which sell prerecorded music throughout the United States. Beginning in 1990, Camelot established a Corporate-Owned Life Insurance ("COLI") plan to provide funding for future liabilities in connection with its self-insured employee benefit plans. Under the COLI plan, Camelot purchased individual whole life insurance policies on the lives of approximately 1,400 of its employees and officers. n1 Camelot is the sole owner and beneficiary of these policies. To the extent Camelot used loans to pay premiums due on the policies, Camelot deducted the interest **[*3]** payments on an accrual basis for the appropriate periods on its federal income tax returns. Camelot claimed tax deductions for interest payments it made in connection with its COLI program from 1991 to 1993.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The face value of these individual insurance policies varied inversely with the age of the covered employee, e.g., the younger the employee, the higher the face value of the insurance policy.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On August 9, 1996, Camelot's predecessors-in-interest filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. During pendency of the bankruptcy proceeding, the Internal Revenue Service ("IRS") filed proof of claim against Camelot based on its assertion that tax deductions claimed by Camelot for its COLI plan were disallowable under Internal Revenue Code ("IRC") (26 U.S.C.) §§ 163(a) and 264(c)(1). n2 Camelot filed a Limited Objection to the IRS proof of claim disputing the IRS assertions. The IRS responded to Camelot's Objection by filing in this Court a motion under 28 U.S.C. § **[*4]** 157(d) for mandatory withdrawal of the reference to the Bankruptcy Court. In an opinion dated May 29, 1998, this Court granted the IRS motion for mandatory withdrawal and withdrew reference of this contested matter between Camelot and the IRS from the Bankruptcy Court.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In 1996, Congress passed a law, which as of January 1, 1999, *HN1* would disallow interest deductions on loans with respect to Company-Owned Insurance. *See* IRC § 264(d). That being said, this new law does not apply to COLI plans, like Camelot's, in existence before 1996. *See id.*

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On February 17, 1999, Camelot filed a motion to change venue, pursuant to 28 U.S.C. §§ 1404(a) and 1412, asking that this case be transferred to the Ohio Court so it could be consolidated with the AEP case, which presents similar issues of law and fact. Around the same time, Camelot also entered into a merger agreement with its principal competitor, TransWorld Entertainment Inc. Under the terms of the agreement, TransWorld will be the surviving company and the combined **[*5]** business will be managed out of Albany, New York.

## III. DISCUSSION

This analysis begins with the language of the transfer statutes, 28 U.S.C. §§ 1404(a) and 1412, both of which provide for transfer of venue upon fulfillment of certain conditions. The general transfer statute found in *HN2* section 1404(a) provides:

> For the convenience of the parties and the witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

The transfer statute governing bankruptcy matters, found at *HN3* 28 U.S.C. § 1412, provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

The decision to transfer venue under either section 1404 and 1412 has been determined to turn on the same issues. *In re Emerson Radio Corp.*, 52 F.3d 50, 55 (3d Cir. 1995) ("Section 1412 largely include[s] the same criteria for the transfer of cases as section 1404(a), i.e., 'the interest of justice' or 'the convenience of the parties'. . . ."). The only factor not expressly listed in **[*6]** section 1412 is the convenience of the witnesses. n3 However, courts which use section 1412 to determine the merits of a transfer motion subsume the convenience of the witness' inquiry into the convenience of the parties inquiry. *See e.g., In re Oklahoma City Assocs.*, 98 B.R. 194, 199 (Bankr. E.D. Pa. 1989); *In re Indus. Pollution Control, Inc.*, 137 B.R. 176, 181 (Bankr. W.D. Pa. 1992).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Also, absent from section 1412 is a requirement that the proposed transferee forum be one in which the original action could have initially been brought. In this case, the original action could have initially been brought in the Southern District of Ohio, Eastern Division. Camelot's principal place of business is in North Canton, Ohio. Camelot, therefore, would have been amenable to personal jurisdiction in Ohio. Also, venue would have been proper in the Southern District of Ohio, Eastern Division. *See* 28 U.S.C. § 1391(c).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995), the Third Circuit Court **[*7]** of Appeals listed a number of factors deemed to be relevant to the inquiry beyond those enumerated in the statute. The factors listed by the *Jumara* court are set forth as follows:

> In ruling on § 1404(a) motions, courts have not limited their considerations to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." While there is no definitive formula or list of factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).*HN4*⚓
>
> The private interest include: (1) plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses -- but only to extent that the witnesses may actually be unavailable **[*8]** for trial in one of the fora, and (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).*HN5*⚓
>
> The public interest include: (1) the enforceability of the judgment, (2) practical considerations that would make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, (5) the public policies of the fora, and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80 (citations omitted). As Camelot's motion to change venue relies for support mainly on public interest factors, the Court will address them first.

**A. Public Interest Factors**

The primary if not the sole public interest factor, which Camelot relies upon, is the presence of "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara* 55 F.3d at 879. Camelot asserts transferring this case to the Ohio Court would promote judicial economy because that court has pending before it the AEP case, which presents similar **[*9]** issues of law and fact. The issue in both cases is whether the taxpayers are entitled to interest deduction under §§ 163(a) and 264(c)(1) of the IRC.

Camelot argues there would be a tremendous saving of judicial resources if its motion to change venue to the Ohio Court were granted because then (i) only one court would have to address the common legal issues presented, and (ii) each court would not have to individually listen to testimony from ten to twelve "identical" expert witnesses and as many as an additional sixteen "identical" third-party witnesses.

In addition, Camelot argues the trial would be less expensive to all the parties involved if the two actions were consolidated before the Ohio Court. In its brief Camelot states that sharing expert witnesses with AEP will enable it to realize significant savings by not having to hire duplicative expert witnesses.

The Court is not persuaded by Camelot's assertion that transferring this case to the Ohio Court would make the trial easy, expeditious, and less expensive. During oral argument, Camelot, contrary to its position in its briefs, advised it has been unable to reach an agreement with AEP to share expert witnesses and the **[*10]** attendant costs. This admission by Camelot is significant because much of its argument revolves around the "saving of duplicative costs and resources" by not having two sets of taxpayer expert witnesses.

Transferring this action to the Ohio Court will not result in conserving judicial resources. This becomes apparent when recognizing the practical difficulty the Ohio Court would face if it attempted to consolidate the two cases. There would likely be a bifurcation of the overall proceeding into three separate hearings. One hearing would deal with the structure and mechanics of the COLI plans, which Camelot and AEP purchased. Any saving of judicial resources realized from the similarity in structure of the two COLI plans will be largely lost by the presence of two different groups of taxpayer expert witnesses. The judge after listening to the government's expert witnesses would then have to hear from two separate groups of taxpayer expert witnesses. The Court does not believe this process would result in saving of judicial resources, if anything, it may cause confusion. In addition, there would be a need for a second hearing to examine economic variables specific to each taxpayer, **[*11]** such as interest rates. The interest rate AEP, a larger business, would likely to be different from the interest rate charge Camelot, a much smaller entity, would have to incur. n4 Further a third hearing would be needed to address each taxpayer's business purpose. Given these facts, it is more likely than not that saving of significant judicial resources will not be realized if there were a transfer.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 As the Court understands it, the interest rates that the parties paid on their COLI policies are going to play a significant part in determining if there was an economic substance to the COLI policies.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Camelot's admission during oral argument that it has been unable to reach an agreement with AEP to share expert witnesses belies its prior assertion that it would realize significant savings in the area of expert witnesses fees. The remaining public interest factors enunciated by the Third Circuit Court of Appeals in *Jumara* also do not support Camelot's position. First, there is no question that a judgment **[*12]** entered by this Court will be enforced in Ohio. Second, neither party has proffered any information which would suggest to this Court that the District of Delaware docket is any less congested than the docket of the Southern District for Ohio, Eastern Division. Third, Ohio does not have a public interest in adjudicating this case. The only connection which Ohio has with case is soon going to disappear. Camelot

which has its principal place of business in Ohio is being acquired by TransWorld Entertainment and the combined business will be managed out of Albany, New York.

## B. Private Interests

Both parties contend the private interest factors of (i) plaintiff's original choice of forum, (ii) convenience of the witnesses, (iii) convenience of the parties, and (iv) situs of the cause of action support their respective positions. The Court will address each of these private interest factors in turn. n5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The Court will not address the private interest factor of location of books and records as it has not been raised by the parties.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*13]**

## 1. Plaintiff's Original Choice of Forum

As a general rule, *HN6* the plaintiff's choice of forum is given substantial weight and will not be disturbed unless other factors weigh substantially in favor of the transfer. *See Jumara* at 879 ("courts normally defer to a plaintiff's choice of forum"); *In re Warrick,* 70 F.3d 736, 740 (2d Cir. 1995) (plaintiff's choice of forum "entitled to substantial consideration").

On August 9, 1996, Camelot's predecessors-in-interest filed a voluntary bankruptcy petition with the Delaware Bankruptcy Court. During the pendency of the bankruptcy proceeding, the IRS filed proof of claim, which gave rise to the current cause of action. Clearly, by happenstance, if not otherwise, Delaware is the IRS original choice of forum and will not be disturbed in the absence of significant countervailing factors favoring transfer to the Southern District of Ohio, Eastern Division.

## 2. Convenience of the Witnesses

Courts in analyzing the convenience of witnesses, distinguish between party witnesses and non-party witnesses. The former are presumed to be willing to testify in either forum despite the inconvenience that one of the forums would entail. The **[*14]** non-party witnesses, on the other hand, may be unwilling to testify and may not be compelled to do so if they reside more than 100 miles from the court at which the trial is held. *See U.S. Fidelity and Guar. Co. v. Republic Drug Co., Inc.,* 800 F. Supp. 1076, 1082 (E.D.N.Y. 1992); *Houk v. Kimberly-Clark Corp.,* 613 F. Supp. 923, 931 (W.D. Mo. 1985).

At oral argument, counsel for Camelot represented he would call only three of Camelot's employees as witnesses. Currently, they reside in Ohio and, according to Camelot's counsel, are likely to be employed by TransWorld Entertainment on the consummation of the merger. The inconvenience to these three employees, all of whom are officers of Camelot, is slight given that at least two of them have made prior appearances before the Delaware Bankruptcy Court in connection with Camelot's Chapter 11 petition.

A majority of the witnesses expected to testify at trial are either third-party witnesses or expert witnesses. Camelot argues if this case were transferred to the Ohio Court, third party witnesses would be saved the expense associated with appearing at an additional proceeding. None of the third party witnesses listed in Camelot's **[*15]** memorandum, however, are subject to the subpoena power of either the District of Delaware or the Southern District of Ohio. The witnesses live in diverse places such as Florida, Georgia, and Connecticut. Non-

party witnesses who do not reside in or near either the transferor or the transferee district, and thus are not amenable to process in either district, are not given any weight in the transfer analysis. *See Aquatic Amusement Associates, Ltd. v. Walt Disney World Co.*, 734 F. Supp. 54, 58 (N.D.N.Y. 1990).

Not one to be dissuaded, Camelot contends expert witnesses will be saved from incurring additional costs if there were to be only one proceeding. Camelot's contention is made moot because both AEP and Camelot intend to call their own expert witnesses who would need to appear only at their party's trial.

### 3. Convenience of the Parties

Camelot asserts the convenience of the parties dictates this case be transferred to the Ohio Court. Camelot argues appearing before the Ohio Court would be more convenient because its principal place of business is located in Ohio. The IRS, Camelot contends, is no more inconvenienced by having to appear before this Court versus the Ohio **[*16]** Court because it has offices in both states.

The Court is not persuaded by Camelot's arguments. As discussed Camelot intends to call only three of its employees as witnesses. Moreover, the Court is skeptical of Camelot's new found claim of inconvenience. Camelot apparently was not concerned about convenience when it filed its voluntary bankruptcy petition in Delaware, something it could have as easily and conveniently done in Ohio. In an about face, Camelot now states for purposes of this action which arises from its bankruptcy filing, it would be more convenient if the case were transferred to Ohio. The Court concludes the convenience of the parties does not favor transfer in this case.

### 4. Where the Claim Arose

For the purpose of convenience analysis, pinpointing where the operative events took place is not always an exact science. Camelot asserts the claim arose in Ohio because (i) it entered into a contract to purchase the COLI policies in Ohio, (ii) the insurance company which sold the COLI policies is an Ohio corporation, and (iii) all premium payments, including repayment of policy loans and interest accrued on the loans were made in Ohio. The IRS, on the other hand, **[*17]** argues Camelot chose the Delaware District in which to file its bankruptcy petition. With Camelot having chosen the venue, the IRS argues the claim arose in Delaware because it filed its proof of claim in the Bankruptcy Court for the District of Delaware. Until such time the IRS filed its proof of claim in the District chosen by Camelot, there was no claim which gives rise to the present cause of action.

While the issue is close, the Court agrees with the IRS position that the claim arose in Delaware. The legal issue before this Court is whether Camelot is allowed to claim as a tax deduction the interest payments it made on the loans it had taken out against the COLI policies. This dispute between the IRS and Camelot arose when the IRS filed proof of claim disputing the tax deductions before the Delaware Bankruptcy Court.

The Court holds that neither the public nor the private interest factors favor transfer of this action to the United States District Court for the Southern District of Ohio, Eastern Division. Camelot's motion to change venue will, therefore, be denied.

An appropriate order will issue.

Source: Legal > / . . . / > DE Federal District Courts ⓘ
Terms: **name(internal revenue service and cm holdings)**  (Edit Search | Suggest Terms for My Search)
View: Full

Date/Time: Monday, October 16, 2006 - 9:45 AM EDT

* Signal Legend:
- 🔴 - Warning: Negative treatment is indicated
- [Q] - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- 🅐 - Citing Refs. With Analysis Available
- 🅘 - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis®**

About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

## CERTIFICATE OF SERVICE

Thomas G. Whalen, Jr., hereby certifies that on October 18, 2006, a true and correct copy

of the foregoing *Opening Brief in Support of their Motion to Transfer Venue* and *Appendix to*

*Defendants' Opening Brief in Support of their Motion to Transfer Venue* was served on the

parties listed below via hand delivery or United States First Class Mail, postage pre-paid:

William H. Sudell, Jr., Esq.
Gilbert R. Saydah, Jr., Esq.
Margaret E. Juliano, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE   19899-1347

Michael E. Wiles, Esq.
Suzanne M. Grosso, Esq.
Julie M. Calderon, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY   10022

/s/ Thomas G. Whalen, Jr.
Thomas G. Whalen, Jr.

2